BRIAN P. LIDDLE AND BRENDA H. LIDDLE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2126–92.          Filed August 22, 1994.

*David Lyle Segal* and *Jeffry H. Homel,* for petitioners.
*Douglas A. Fendrick,* for respondent.

LARO, *Judge:* This case was assigned to and heard by Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(3) of the Internal Revenue Code, and pursuant to Rules 180, 181, and 182, Tax Court Rules of Practice and Procedure. The case is now assigned to Judge David Laro. The Court agrees with and adopts the findings of fact of the Special Trial Judge, who reached a contrary legal conclusion.

Brian P. and Brenda H. Liddle petitioned the Court for redetermination of respondent's determinations reflected in a notice of deficiency issued to them on November 20, 1991. The notice reflected respondent's determination of a $602 deficiency in petitioners' Federal income tax for 1987. Section references are to the Internal Revenue Code in effect for 1984, see *infra* note 3, and Rule references are to the Tax Court Rules of Practice and Procedure. The term "petitioner" in the singular is used to refer to Brian P. Liddle.

Following concessions by the parties,[1] the sole issue for decision is whether petitioners are entitled to the 1987 depreciation deduction that they claimed under the accelerated cost recovery system (ACRS), sec. 168, on a 17th-century Ruggeri bass viol (viol) that petitioner used in his trade or business as a full-time professional musician. As discussed below, we hold that petitioners are entitled to this depreciation deduction.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Philadelphia, Pennsylvania, when they filed their petition.

Petitioner has played the bass viol professionally for over a decade. He studied under Roger M. Scott, principal bassist

---

[1] Petitioners conceded that a $26 increase in "other income" and $275 increase in interest income were proper. Respondent allowed $1,304 in additional miscellaneous deductions.

of the Philadelphia Orchestra, while ᴊ a full scholarship at the Curtis Institute of Music. He has ᵢ ʳformed with various professional music organizations, inclu ᐟng the Philadelphia Orchestra, the Baltimore Symphony, the Pennsylvania ProMusica, and the Performance Organiz⌄⌄ion.

The viol was built by Francesco Ruggeri (c. 1620–1695), a luthier active in Cremona, Italy. He studied stringed instrument construction under Nicolò Amati, who also instructed Antonio Stradivari. His other contemporaries include the craftsmen Guadanini and Guarneri. These artisans are members of the so-called Cremonese School of instrument makers.

Petitioner purchased the viol for $28,000 on November 8, 1984; at that time, it was in an excellent state of restoration, and had no apparent cracks or other damage. He insured the viol for its then-appraised value of $38,000. Petitioner acquired the viol with the belief that it would serve him throughout his professional career, about 30 to 40 years. However, he exchanged it for a Domenico Busan 18th-century bass viol (Busan) on May 10, 1991, that was appraised at $65,000 on the date of the exchange. Petitioner thought that the "more vocal" tonal quality of the Busan would appeal to audition committees more than the "rich, deep" sound of the viol.

The market among nonmusicians for Cremonese School instruments flourishes. Many collectors primarily seek out the "label"; i.e., the maker's name on the instrument as verified by the certificate of authenticity. Being nonplayers, they do not overly concern themselves with the physical condition of the instrument; they have their eye only on the market value of the instrument as a collectible. As the quantity of these instruments has declined through loss or destruction over the years, the value of remaining instruments as collectibles has experienced a corresponding increase.

A stringed instrument, when used on a regular basis, must receive proper maintenance in order to preserve its tonal quality and retard the decay of the instrument. Among other things, the constant playing of a stringed instrument results in wear and tear, nicks and scratches to the exterior of the instrument, and wear to the varnish. In addition, stringed instruments lose mass due to the acidic qualities of perspiration from the performer's hands as well as through the natu-

ral oxidation of the wood. Furthermore, the climate affects the condition of a stringed instrument; the climate changes the structural integrity of: (1) The top of the instrument, and (2) the piece of wood fitted inside the body of the instrument that supports the bridge and governs the instrument's timbre. Some of the more significant indices of climatic wear are the opening of the instrument's seams and the opening (or reopening) of cracks.[2] While instruments of this nature are subject to the general wear and tear that instruments used by musicians experience, there is no evidence that such wear and tear exhausts the utility and value of the instruments over definite time periods. The prices of instruments similar to the viol that are properly maintained have increased over many years.

During the time relevant herein, petitioner used the viol as his primary instrument in his full-time professional work as a musician; he used it for practice, auditions, rehearsals, and performances with symphony orchestras. Petitioner's use of the viol subjected it to wear and tear that did not reduce its economic value.

On petitioners' joint 1987 Federal income tax return, they claimed a depreciation deduction of $3,170 with respect to the viol, under section 168.[3] Respondent disallowed this deduction in full, stating in her notice of deficiency that the viol "in fact will appreciate in value and not depreciate".

## OPINION

The facts of this case are remarkably similar to the facts in the Court's recent opinion in *Simon v. Commissioner*, 103 T.C. 247 (1994). In *Simon*, we held that the taxpayers were allowed to deduct depreciation under ACRS, sec. 168, on two 19th-century violin bows that they regularly used in their trade or business as full-time professional violinists. Due to the similarity between the instant case and *Simon*, our

---

[2] The seams of a stringed instrument open up by design to prevent cracking of the woodgrain. These openings may occur several times during a season, and severe damage will result if the opened seam goes unchecked.

[3] Because the viol was placed in service in 1984, the Internal Revenue Code applicable to that year governs the computation of its depreciation for petitioners' 1987 taxable year. Sec. 168; see also the Tax Reform Act of 1986 (TRA), Pub. L. 99–514, secs. 201(a), 203(a)(1), 100 Stat. 2085, 2121, 2143 (in general, TRA amended sec. 168 effective for property placed in service after Dec. 31, 1986, in taxable years ending after that date).

analysis and conclusion here today naturally flow from our opinion in *Simon v. Commissioner, supra.*

The burden of proof is on petitioners to show that respondent's determinations set forth in her notice of deficiency are incorrect. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933). The issue that we must decide is whether petitioners are entitled to deduct depreciation under ACRS with respect to the viol.

Depreciation deductions allow a taxpayer to recover his or her investment in an income-producing asset over its useful life. *United States v. Ludey,* 274 U.S. 295 (1927); *Macabe Co. v. Commissioner,* 42 T.C. 1105, 1109 (1964). To this end, taxpayers have long been allowed to recover their investments through allocations of depreciation deductions that represent their expenses of using an income-producing asset in the different periods that are benefited by that asset. *Massey Motors, Inc. v. United States,* 364 U.S. 92, 104 (1960); *United States v. Ludey, supra* at 300–301. The primary purpose of allocating depreciation to more than 1 year is to provide a more meaningful matching of the cost of an income-producing asset with the income therefrom; this meaningful match, in turn, bolsters the integrity of the taxpayer's periodic income statements. *Hertz Corp. v. United States,* 364 U.S. 122, 126 (1960); *Massey Motors, Inc. v. United States, supra* at 104. In this sense, depreciation allocations represent a return to the taxpayer of his or her investment in the income-producing property over the years in which depreciation is allowed; such an allocation does not necessarily reflect a decline in the market value of the underlying asset. *Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 277 (1966); *Virginian Hotel Corp. v. Helvering,* 319 U.S. 523, 528 (1943); *Detroit Edison Co. v. Commissioner,* 319 U.S. 98, 101 (1943). In the same sense, an allocation of depreciation to a given year represents that year's reduction of the underlying asset through physical wear and tear. *United States v. Ludey, supra* at 300–301. This rationale for depreciation deductions is seen from the fact that the Congress designed ACRS to provide investment stimulus by allowing businesses to deduct costs of capital expenditures more quickly than was allowed previously. S. Rept. 97–144, at 47 (1981), 1981–2 C.B. 412, 425. See generally Staff of Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax

Act of 1981, at 75 (J. Comm. Print 1981) (hereinafter referred to as the 1981 Bluebook).

Prior to the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97–34, 95 Stat. 172, personal property was depreciated pursuant to section 167 of the Internal Revenue Code of 1954 (the 1954 Code). The regulations under section 167 expanded on its text by providing that personal property was depreciable before ERTA only if the taxpayer established the useful life of the property. See sec. 1.167(a)–1(a) and (b), Income Tax Regs. The "useful life" of property under pre-ERTA law was the period over which the asset could reasonably be expected to be useful to the taxpayer in his or her trade or business, or in the production of his or her income. *Fribourg Navigation Co. v. Commissioner, supra* at 277; *Massey Motors, Inc. v. United States, supra*; sec. 1.167(a)–1(b), Income Tax Regs. The primary method that was utilized to ascertain the useful life for personal property was the asset depreciation range (ADR) system. For a brief discussion of the ADR system, see *Simon v. Commissioner, supra* at 254–255; S. Rept. 97–144, at 39 (1981), 1981–2 C.B. at 421.

In enacting ERTA, the Congress found that the pre-ERTA rules for determining depreciation allowances were unnecessarily complicated and did not generate the investment incentive that was critical for economic expansion. The Congress believed that the high inflation rates prevailing at that time undervalued the true worth of depreciation deductions and, hence, discouraged investment and economic competition. The Congress also believed that the determination of useful lives was "complex", "inherently uncertain", and "frequently [resulted] in unproductive disagreements between taxpayers and the Internal Revenue Service." S. Rept. 97–144, *supra* at 47, 1981–2 C.B. at 425. See generally 1981 Bluebook, at 75. Accordingly, the Congress decided that a new capital cost recovery system would have to be structured which, among other things, lessened the importance of the concept of useful life for tax depreciation purposes. S. Rept. 97–144, *supra* at 47, 1981–2 C.B. at 425. See generally 1981 Bluebook, at 75. This new system is ACRS; the rules implementing ACRS were prescribed in section 168. ACRS is mandatory and applies to most tangible depreciable assets placed in service after 1980 and before 1987. ERTA sec.

209(a), 95 Stat. 172; see also Tax Reform Act of 1986, Pub. L. 99–514, secs. 201(a), 203(a)(1), 100 Stat. 2085, 2121, 2143.

Through ERTA, the Congress minimized the importance of useful life by: (1) Reducing the number of periods of years over which a taxpayer could depreciate his or her property from the many relatively long periods of time included in the ADR system to the four short periods of time included in ERTA (i.e., the 3-year, 5-year, 10-year, and 15-year ACRS periods), and (2) basing depreciation on an arbitrary statutory period of years that was unrelated to, and shorter than, an asset's estimated useful life. This minimization of the useful life concept through a deemed useful life was in spirit with the two main issues that ERTA was designed to address, namely: (1) Income tax problems that resulted mainly from complex depreciation computations and useful life litigation, and (2) economic policy concerns that the pre-ERTA depreciation systems spread the depreciation deductions over such a long period of time that investment in income-producing assets was discouraged through the income tax system. S. Rept. 97–144, *supra* at 47, 1981–2 C.B. at 425. See generally 1981 Bluebook, at 75.

With respect to the pre-ERTA requirement of useful life, the Commissioner had initially taken the position that a taxpayer generally could not deduct depreciation on expensive works of art and curios that he purchased as office furniture. See A.R.R. 4530, II–2 C.B. 145 (1923). This position was superseded by a similar position that was reflected in Rev. Rul. 68–232, 1968–1 C.B. 79. That ruling states:

A valuable and treasured art piece does not have a determinable useful life. While the actual physical condition of the property may influence the value placed on the object, it will not ordinarily limit or determine the useful life. Accordingly, depreciation of works of art *generally* is not allowable. [Emphasis added.]

In the instant case, respondent determined that petitioners were not entitled to deduct depreciation for the viol because it will appreciate in value. On brief, respondent also argues that the useful life of the viol is indeterminable because the viol is a "work of art" for which it is impossible to determine a useful life. In this regard, respondent contends that petitioners must prove a specific or reasonable estimate of

the number of years that the viol will be useful to them in order to depreciate it under ACRS.

We disagree with respondent that petitioners may not depreciate the viol under ACRS. ERTA was enacted partially to address and eliminate the issue that we are faced with today, namely, a disagreement between taxpayers and the Commissioner over the useful life of assets that were used in taxpayers' trades or businesses. With this "elimination of disagreements" purpose in mind, the Congress designed ERTA to include five broad classes of "recovery property" and to include four short periods of years over which taxpayers could recover their costs of "recovery property". See sec. 168(b) and (c), as added to the 1954 Code by ERTA. Two of these classes, the 3-year and 5-year classes, encompassed all tangible personal property (other than public utility property); the 3-year class included certain short-lived assets such as automobiles and light-duty trucks, and the 5-year class included all other tangible personal property that was not within the 3-year class. Sec. 168(c)(2), as added to the 1954 Code by ERTA; see also H. Conf. Rept. 97–215, at 206–208 (1981), 1981–2 C.B. 481, 487–488. Thus, under section 168, as added to the 1954 Code by ERTA, personal property (other than public utility property) that is "recovery property" must be either 3-year or 5-year class property. Sec. 168(c)(2), as added to the 1954 Code by ERTA ("Each item of recovery property shall be assigned to one of the following classes of property"). Although "3-year property" requires a taxpayer to determine whether the property had a class life of 4 years or less under the ADR system, the term "5-year property" is appropriately designed to include all other section 1245 class property (other than public utility property). *Id.* For this purpose, the term "section 1245 class property" was defined liberally to include personal property that "*is or has been* property of a character subject to the allowance for depreciation provided in section 167". Secs. 168(g)(3), 1245(a)(3) of the 1954 Code as amended by ERTA (emphasis added).

Inasmuch as section 168(a) allows a deduction with respect to "recovery property", petitioner may claim such a deduction on the viol if it falls within the meaning of that term. The term "recovery property" is defined broadly to mean: (1) Tangible property, (2) of a character subject to the allowance for

depreciation, (3) used in a trade or business or held for the production of income, and (4) placed in service after 1980. Sec. 168(c)(1); see also ERTA sec. 209(a), 95 Stat. 172. Accordingly, as we held in *Simon v. Commissioner,* 103 T.C. 247 (1994), a plain reading of the applicable statutory language leads to the conclusion that property is "recovery property" if it is: (1) Tangible, (2) placed in service after 1980, (3) used in a trade or business, or held for the production of income, and (4) of a character subject to the allowance for depreciation.[4] See also sec. 168(c)(1); ERTA sec. 209(a), 95 Stat. 172; *Noyce v. Commissioner,* 97 T.C. 670, 689 (1991).

The viol fits snugly within the definition of recovery property. First, it is indisputable that the viol is tangible property, and that it was placed in service after 1980. Thus, the first two requirements for ACRS depreciation are met. Second, petitioner regularly used the viol in his trade or business as a professional musician. Accordingly, petitioners have also met the third requirement.

The last requirement for deducting depreciation on personal property under section 168 is that the property must be "of a character subject to the allowance for depreciation". The quoted term is undefined in the 1954 Code. Comparing the language that the Congress used in section 167(a) of the 1954 Code immediately before its amendment by ERTA[5] with the language that it used in section 168(a) and (c)(1) as added to the 1954 Code by ERTA,[6] we believe that the Con-

---

[4] It is a cardinal principle of statutory construction that the interpretation of a statute starts with the text therein. *Landgraf v. USI Film Prods.,* 511 U.S. ___, 114 S. Ct. 1483 (1994); *Consumer Prod. Safety Commn. v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980). Statutory language is interpreted by giving each word its plain, obvious, and rational meaning. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68 (1982); *United States v. Merriam,* 263 U.S. 179, 187–188 (1923). Where the text of a statute is clear, statutory construction ends there; the statute must be enforced as written. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989).

[5] Sec. 167(a) of the 1954 Code, immediately before its amendment by ERTA, provided:

SEC. 167(a). GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

　　(1) of property used in the trade or business, or
　　(2) of property held for the production of income.

[6] Sec. 168(a) and (c), as added to the 1954 Code by ERTA, provided:

SEC. 168(a). ALLOWANCE OF DEDUCTION.—There shall be allowed as a deduction for any taxable year the amount determined under this section with respect to recovery property.

　　　*　　*　　*　　*　　*　　*　　*

(c) RECOVERY PROPERTY.—For purposes of this title—
　　(1) RECOVERY PROPERTY DEFINED.— * * * the term "recovery property" means tangible property of a character subject to the allowance for depreciation—

gress used the term "depreciation" in section 168(c)(1) to refer to the term "exhaustion, wear and tear (including a reasonable allowance for obsolescence)" that is contained in section 167(a) of the 1954 Code immediately before its amendment by ERTA. *Simon v. Commissioner, supra* at 260; *Noyce v. Commissioner, supra* at 689. Accordingly, petitioners will meet the final requirement under section 168 if the viol is subject to exhaustion, wear and tear, or obsolescence.[7]

Petitioner, through his testimony and through the testimony of his expert witness, has convinced us that the viol suffered wear and tear during the year in issue. See also *Massey Motors, Inc. v. United States,* 364 U.S. 92, 96 (1960) ("assets [other than ordinary stock in trade], employed from day to day in business, generally decrease in utility and value as they are used"). We disagree with respondent that the viol is a "work of art". A "work of art" is a passive object, such as a painting, sculpture, or carving, that is displayed for admiration of its aesthetic qualities. See Webster's New World Dictionary 1539 (3d coll. ed. 1988). The viol, by contrast, functioned actively, regularly, and routinely to produce income in petitioner's trade or business. Although a computer utilized by a child to play games is not depreciable, the same computer is depreciable if it is used actively, regularly, and routinely by a data processor in his or her trade or business. By the same token, the viol could have been a nondepreciable work of art except for the fact that petitioner used it actively, regularly, and routinely in his full-time business.

Accordingly, having satisfied the four-prong *Simon* test, petitioners are entitled to their claimed depreciation deduction on the viol for the year in issue. Allowing petitioners to depreciate the viol comports with the text of section 168, and enables them to match their costs for the viol with the income generated therefrom. Refusing to allow petitioners to

---

(A) used in a trade or business, or

(B) held for the production of income.

[7] The viol will also be "section 1245 class property" if it is subject to exhaustion, wear and tear, or obsolescence. In this regard, the viol constitutes "property *of a character* subject to the allowance for depreciation provided in section 167". Sec. 1245(a)(3) of the 1954 Code as amended by ERTA (emphasis added); see *John R. Thompson Co. v. United States,* 477 F.2d 164, 169 (7th Cir. 1973) ("Except to the extent that they are subject to physical decay * * *, works of art are not depreciable"); *Associated Obstetricians & Gynecologists, P.C. v. Commissioner,* T.C. Memo. 1983–380 ("respondent admits that * * * [her position in Rev. Rul. 68–232, 1968–1 C.B. 79] would not prohibit depreciation deductions with respect to artworks if the physical condition of the property can be shown to limit or determine its useful life"), affd. 762 F.2d 38 (6th Cir. 1985).

deduct depreciation on the viol, on the other hand, would contradict section 168 and vitiate the accounting principle that allows taxpayers to write off income-producing assets against the income produced by those assets.

With respect to respondent's arguments in support of a contrary holding, we believe that respondent places too much reliance on the fact that the viol has appreciated in value since petitioner acquired it. Indeed, respondent believes that this appreciation, in and of itself, serves to prevent petitioners from claiming any depreciation on the viol. We disagree; section 168 does not support respondent's proposition that a taxpayer may not depreciate a business asset due to the fact that the asset may appreciate in value over time. *Simon v. Commissioner*, 103 T.C. at 261 (taxpayer allowed to deduct depreciation under section 168 on two 19th-century violin bows that appreciated in value); *Noyce v. Commissioner*, 97 T.C. at 675 (taxpayer allowed to deduct depreciation under section 168 on an airplane that appreciated in economic value by 27 percent from the date of purchase until the time of trial). In arguing that an asset that appreciates because of its scarcity is never depreciable, respondent misapplies the well-established, separate concepts of tax accounting which are used to account for the physical depreciation of an asset, on the one hand, and a change in the asset's value due to price fluctuations in the market, on the other hand.[8] See *Fribourg Navigation Co. v. Commissioner*, 383 U.S. 272, 277 (1966); *Macabe Co. v. Commissioner*, 42 T.C. 1105, 1109 (1964). Respondent also has intertwined the mutually exclusive provisions that are firmly ingrained in the Internal Revenue Code to report physical depreciation vis-a-vis market value appreciation.[9] As recognized by the opinion of then

---

[8] Accounting for physical depreciation is an annual offset to gross income by way of deductions that represent the exhaustion, wear and tear, or obsolescence of an income-producing asset. This concept appropriately recognizes the fact that wear and tear to an income-producing asset occur on a daily basis through its use and through the passage of time. By contrast, accounting for market-related changes in the values of depreciable property is not reflected daily; these changes are reportable as gain or loss upon the sale of the depreciable asset. See generally subch. P of ch. 1 of the Internal Revenue Code. Unlike the concept of physical depreciation, this latter concept accounts exclusively for the increase or decrease in the market value of an asset on account of price fluctuations caused by inflation, scarcity, or the like; these types of fluctuations are independent of the decrease in the value of an asset through physical depreciation. *Fribourg Navigation Co. v. Commissioner*, 383 U.S. 272, 277 (1966); *Macabe Co. v. Commissioner*, 42 T.C. 1105, 1109–1110 (1964).

[9] We note, for example, that the Congress enacted sec. 1245 in 1962 to minimize any perceived

Chief Justice Warren, "tax law has long recognized the accounting concept that depreciation is a process of estimated allocation which does not take account of fluctuations in valuation through market appreciation." *Fribourg Navigation Co. v. Commissioner, supra* at 277.

With respect to respondent's contention that petitioners must prove a definite useful life of the viol, we acknowledge that the determination of useful life was critical under pre-ERTA law. Indeed, the determination of useful life was necessary and indispensable to the computation of depreciation because taxpayers were required to recover their investments in personal property, less salvage value, over the estimated useful life of the property. Sec. 1.167(a)–1(a), Income Tax Regs. The Congress enacted ERTA, however, to: (1) Avoid constant disagreements over the appropriate useful lives of assets, (2) shorten the writeoff periods for assets, and (3) encourage investment by providing for accelerated cost recovery through the tax law. S. Rept. 97–144, at 47 (1981), 1981–2 C.B. 412, 425. To reach these ends, the Congress eliminated the concept of salvage value and created two short periods over which taxpayers would depreciate tangible personal property (other than public utility property) that was used in a trade or business; the 3-year and 5-year recovery periods, respectively, are the *deemed useful life* of personal property (other than public utility property). See sec. 168(c)(2), as added to the 1954 Code by ERTA. Respondent's contention that a taxpayer must first prove the useful life of personal property before he or she may depreciate it over the 3-year or 5-year period would bring this Court back to pre-ERTA law with respect to *all* personal property and would resurrect the disagreements that the Congress intended to eliminate by its enactment of ERTA. To this, we cannot agree. As we have said:

Availability of deductions for depreciation on tangible property * * * [under ACRS] is dependent solely upon compliance with section 168, which has only two requirements for deduction of depreciation. First, the asset (tangible) must be of a type which is subject to wear and tear, decay,

---

inequities that may have occurred due to the fact that a taxpayer's depreciation deductions offset his or her ordinary income, but the taxpayer's gain on the sale of the depreciable asset was reportable as capital gain. Under sec. 1245, taxpayers must report as ordinary income any gain on a sale of depreciable personal property to the extent of the prior depreciation that they have taken on the property. *Fribourg Navigation Co. v. Commissioner, supra* at 285.

decline, or exhaustion. * * * Second, the property must be used in the tax-payer's trade or business or held for the production of income. * * * The language of the section is unequivocal. [*Noyce v. Commissioner, supra* at 689.]

We have considered all other arguments made by respondent; the Court also considered similar arguments by the Commissioner in *Simon v. Commissioner, supra.* We found all of these arguments to be without merit in *Simon v. Commissioner, supra* at 265, and we find likewise today.

To reflect the concessions by the parties,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

PARKER, COHEN, SWIFT, WRIGHT, PARR, WELLS, RUWE, and COLVIN, *JJ.,* agree with this majority opinion.

CHIECHI, *J.,* dissents.

---

HAMBLEN, *C.J.,* dissenting: I respectfully dissent because I think the legal analysis and conclusion contained in the majority opinion are flawed and incorrect.

My views in this case are in accord with the legal analysis set forth in my dissenting opinion in the companion case of *Simon v. Commissioner,* 103 T.C. 247, 268 (1994) (Hamblen, C.J., dissenting), filed today. I likewise agree with the views expressed in the *Simon* dissenting opinions to the effect that collectibles, having intrinsic and independent value and utility, are not depreciable, even under ACRS, because a determinable useful life generally cannot be established. Moreover, I think the failure to disallow the deduction in question would open a loophole that Congress never intended.

I am persuaded that the statutory interpretation of sections 167 and 168 expressed in the majority opinion is incorrect; pertinent legislative history has been disregarded; the Ruggeri bass viol is both a playable and treasured work of art[1] that should be treated as nondepreciable property; and applicable legal precedent has been ignored.

---

[1] The record shows that antique bass viols are displayed in museums as "works of art".

*Statutory Interpretation and Legislative History*

The majority opinion correctly states that a cardinal principle of statutory construction begins with the language of the statute.[2] It then ignores that principle. The majority must acknowledge that under section 167 petitioner could not prevail, otherwise it must overrule the ratio decidendi of a legion of cases arising under section 167 and the regulations thereunder. Nonetheless, it concludes that the concept of useful life is not used in determining whether property is of a type subject to depreciation under section 168.

Under section 168 both 3-year and 5-year recovery properties are defined as "section 1245 class property." Sec. 168(c)(2)(A) and (B). The next logical inquiry should be to determine the limits of section 1245 class property. To this the majority turns a blind eye. Section 1245 class property is, inter alia, tangible property "which is or has been property of a character subject to the allowance for depreciation provided in section 167." Secs. 1245(a)(3), 168(g)(3). As I understand the majority, this legerdemain is based on the perception of what Congress intended in enacting section 168. Although I do not think the majority's selective reading from the legislative history withstands scrutiny, I am more concerned with its ignoring the statutory language by cutting depreciation free from its section 167 roots, which is precisely what has been done.

*Legal Precedent*

The majority opinion in this case does not specifically cite *Browning v. Commissioner,* T.C. Memo. 1988–293, affd. 890 F.2d 1084 (9th Cir. 1989), or *Clinger v. Commissioner,* T.C. Memo. 1990–459, although the majority in *Simon v. Commissioner, supra,* distinguished those cases. But it bears repeat-

---

[2] In *United States v. American Trucking Associations,* 310 U.S. 534, 543 (1940) (quoting *Ozawa v. United States,* 260 U.S. 178, 194 (1922)), the Supreme Court stated as follows:

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. * * * [Fn. refs. omitted.]

ing that both opinions should be considered and, in my judgment, followed.

In *Browning,* we held that the Stradivarius, Ruggeri, and Gabrielli violins were nondepreciable because the taxpayer, a professional musician, could not prove they had a determinable useful life. In affirming our decision, the Court of Appeals stated:

They [the taxpayers] have failed to show any real decrease in value. The Tax Court did not clearly err when it found that the Brownings did not present sufficient evidence to refute the Commissioner's ruling that the violins would actually appreciate in value over time rather than depreciate.

\* \* \* \* \* \* \*

As the Tax Court noted, antique violins such as a Stradivarius are considered collectible items and not all purchasers need necessarily be professional musicians. Therefore, the violins have a value independent of their tonal qualities and that value may extend their useful lives which makes the violins more like pieces of art. \* \* \*

[890 F.2d at 1086–1087.]

In *Clinger v. Commissioner, supra,* relating to a Gittins oil painting purchased by a professional artist for use in her studio, this Court specifically held:

Accordingly, it is our opinion that the concept of useful life was not eliminated by the enactment of ACRS under ERTA; hence, where respondent has determined that a taxpayer's assets have no determinable useful life and consequently are not depreciable, petitioner must establish that an asset used in a trade or business has a determinable useful life and prove the class of recovery property to which it is assigned. \* \* \*

See, e.g., *Andrew Crispo Gallery, Inc. v. Commissioner,* 16 F.3d 1336, 1342 (2d Cir. 1994), affg. in part, vacating in part and remanding T.C. Memo. 1992–106.

As pointed out in my dissenting opinion in *Simon v. Commissioner, supra* at 272 (Hamblen, C.J., dissenting), the case of *Noyce v. Commissioner,* 97 T.C. 670 (1991), relied upon in the majority opinion here, "stands in sharp contrast to and is distinguishable from *Browning* and *Clinger*".

### Wear and Tear

I question whether the facts of this case are "remarkably similar" to the facts in *Simon.* As strong as the *Simon* facts might be in support of respondent's position, here the facts

relating to the lack of wear and tear to the Ruggeri bass viol are even stronger. The construction of the Ruggeri bass viol is sturdier and less delicate than that of the Tourte bows. Its cost was not consumed or used up during the 7 years petitioner owned it. Its utility as a playable instrument did not decrease. Its value increased, as evidenced by its exchange for the Busan bass viol that had a replacement value of $65,000. Petitioner agreed that, throughout the years he owned the Ruggeri bass viol, he kept it in excellent working condition by regular maintenance. There were no cracks or other damage to it. Wilbur Wamsley, petitioner's expert witness, who had neither seen nor inspected the bass viol in question, testified that he had seen stringed instruments that have suffered damage. It is significant that his report states, in part, as follows:

1. In the hands of a professional musician, a bass viol will be played for several hours per day, transported to concerts and rehearsals, (and in some cases, to auditions), all of which activity, *if professional maintenance is not kept current,* will lead to the deterioration of the instrument, could have a deleterious effect on the quality of its sound, and will ultimately result in the loss of value of the instrument. [Emphasis added.]

The "wear and tear" concept relates to the physical life of tangible property. The physical life must be lessened by wear and tear that cannot be corrected by regular maintenance. See *Lindheimer v. Illinois Bell Tel. Co.,* 292 U.S. 151, 167 (1934) (depreciation represents "the loss, *not restored by current maintenance,* which is due to all the factors causing the ultimate retirement of the property. These facts embrace wear and tear, decay, inadequacy, and obsolescence." (Emphasis added.)).

## *Conclusion*

Clearly petitioner has not met his burden of proving that the Ruggeri bass viol has a determinable useful life or the particular class of recovery property to which it was assigned by petitioner. This is borne out by petitioner's own testimony and that of two expert witnesses. Petitioner stated that when he purchased the Ruggeri bass viol, he subjectively anticipated that he would play the instrument until the end of his career. He was not sure how long that would be, but he thought it would be 30 to 40 years. Consequently, I think

common sense tells us that it is chimerical to attribute a 5-year life to a bass viol that has been in existence for almost 3 centuries, and may last for many more as either a playable or a treasured work of art.

Accordingly, I would hold that the Ruggeri bass viol was not of a character subject to the allowance for depreciation.

CHABOT, JACOBS, WHALEN, and HALPERN, *JJ.,* agree with this dissent.

---

GERBER, *J.,* dissenting: I respectfully dissent in this case for the same reasons expressed in my dissenting opinion in *Simon v. Commissioner,* 103 T.C. 247, 281 (1994) (Gerber, J., dissenting).

---

HALPERN, *J.,* dissenting: Section 168(a) allows a deduction with respect to recovery property. For purposes of section 168(a), property is recovery property if, among other things, it is tangible property of a character subject to the allowance for depreciation. Sec. 168(c)(1). Petitioners bear the burden of proving that the viol is recovery property. Rule 142(a). The majority has found that "Petitioner's use of the Viol subjected it to wear and tear that did not reduce its economic value." Majority op. p. 288. The majority has also found that, with regard to valuable instruments such as the viol, "there is no evidence that such wear and tear [as is suffered by musical instruments in general] exhausts the utility and value of the instruments over definite time periods." *Id.* Based on those two findings, I would conclude that petitioners have failed to carry their burden of proving that the viol is recovery property, because they have failed to prove that it is of a character subject to the allowance for depreciation. Accordingly, I would hold for respondent that petitioners are not entitled to a deduction under section 168 with respect to the viol.

*Relationship Between Sections 167 and 168*

Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer

for the production of income shall be allowed as a depreciation deduction. In the case of recovery property within the meaning of section 168, the deduction allowable under section 168 is, with certain exceptions, deemed to constitute the reasonable allowance provided for by section 167. If not clear from the face of the statute, pertinent legislative history makes clear that no property for which a depreciation deduction would be unavailable under section 167 can qualify for a deduction under section 168.[1] Indeed, section 1.168–3(a)(1)(ii), Proposed Income Tax Regs., 49 Fed. Reg. 5957 (Feb. 16, 1984), states: "Property is considered recovery property only if such property would have been depreciable under section 167."

### The Relationship of Wear and Tear to Useful Life

Under section 167, it is necessary to establish the useful life of property in order to determine the year's allowance for exhaustion, wear and tear, and obsolescence. Section 1.167(a)–1(a), Income Tax Regs., provides, in part:

The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and § 1.167(g)–1. * * *

It is beyond dispute that no deduction is allowable under section 167 with respect to property that does not have a determinable useful life (i.e., a useful life capable of being settled, fixed, or determined). See, e.g., *Westinghouse Broadcasting Co. v. Commissioner,* 309 F.2d 279 (3d Cir. 1962) (no depreciation deduction for television network affiliation contract automatically renewable for successive 2-year terms), affg. 36 T.C. 912 (1961); *Harrah's Club v. United States,* 228 Ct. Cl. 650, 661 F.2d 203, 207 (1981) (costs of restoring antique cars and preparing them for showing in museum not depreciable in absence of proof that cars deteriorate or lose value over time: "Property with an indeterminate life is nondepreciable."). Wear and tear clearly are factors to be

---

[1] See S. Rept. 97–144 (1981), 1981–2 C.B. 412, 421, 425 (property eligible for ACRS defined in terms of property eligible for depreciation); H. Conf. Rept. 97–215 (1981) (conference report), 1981–2 C.B. 481, 487 (similar).

considered in fixing or determining the useful life of property. See sec. 1.167(a)–1(b), Income Tax Regs. Nevertheless, the useful life of property may remain undetermined (i.e., undeterminable) *despite* a showing of wear and tear. As Professors Bittker and Lokken have put it: "the taxpayer must be able to show that the property is subject to exhaustion, wear and tear, or obsolescence *during a period whose duration can be estimated with reasonable accuracy*". Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 23.2.4, at 23–32 (2d ed. 1989) (emphasis added); see sec. 1.167(a)–3, Income Tax Regs. (depreciation allowed for intangibles reasonably shown to be of use for only a limited period). Thus, for instance, if regular maintenance would prevent or restore the loss in utility occasioned by wear and tear (such that, on account of such maintenance, the property will not wear out), the expectation of wear and tear alone is an insufficient basis upon which to claim a deduction for depreciation. See *Lindheimer v. Illinois Bell Tel. Co.,* 292 U.S. 151, 167 (1934) (depreciation represents "the loss, *not restored by current maintenance,* which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence." (Emphasis added.)).

## Majority's Findings

The majority finds that the wear and tear suffered by the viol is *not* of a kind that would force the viol to be retired from service after a determinable period. Majority op. p. 288. Indeed, it appears that, with regular maintenance, the viol has remained playable for over 200 years. Simply put, the viol is *not* property subject to wear and tear that, in a tax sense, limits its life and entitles the owner to a deduction for depreciation.

## Majority's Failing

The majority has failed to discriminate between property with a useful life that, although undetermined, *is* determinable and property with a useful life that is *in*determinable. The majority's failure results from its misidentification of "property of a character subject to the allowance for depreciation". See sec. 168(c)(1). By focusing only on wear and tear,

and ignoring altogether whether the useful life of the property is determinable, the majority has identified, and allowed a deduction for, a class of property that contains property for which no deduction is allowable under section 167: viz, property with an indeterminable useful life. Section 168 indicates plainly enough that Congress wished to eliminate *some* disputes over useful life. Nothing indicates, however, that Congress intended to allow a deduction for property of a type that, previously, had been nondepreciable on account of the taxpayer's inability to establish a useful life. Section 168 (as here in issue) was added to the Code by section 201(a) of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97–34, 95 Stat. 172, 203. H. Conf. Rept. 97–215 (1981), 1981–2 C.B. 481, accompanied the conference agreement with respect to H.R. 4242, 97th Cong., 1st Sess. (1981), which was enacted as ERTA. The portion of the Joint Explanatory Statement of the Committee of Conference relevant to section 201(a) of ERTA contains the following:

> *House bill.*—Under present law, assets used in a trade or business or for the production of income are depreciable if they are subject to wear and tear, decay or decline from natural causes or obsolescence. *Assets that do not decline in value on a predictable basis or that do not have a determinable useful life,* such as land, goodwill, and stock *are not depreciable.*
>
> Under the House bill, most tangible *depreciable* property (real and personal) is covered by the accelerated cost recovery system (ACRS). However, ACRS does not apply to (1) property not depreciated in terms of years * * *, and (2) property amortized * * *.
>
> [Emphasis added.]

H. Conf. Rept. 97–215, *supra,* 1981–2 C.B. at 487. It is difficult, if not impossible, to read that language in light of the conference agreement and believe that the conferees intended property with an indeterminable useful life to be eligible for ACRS.

## *Difficulties Faced by the Majority*

The majority's interpretation presents it with clear difficulties. The majority acknowledges that "works of art" remain nondepreciable, and, thus, outside of section 168. Majority op. p. 294. Traditionally, of course, that is because works of art generally lack a determinable useful life. See, e.g., *Clinger v. Commissioner,* T.C. Memo. 1990–459 (petitioner

failed to establish that painting had determinable useful life); Rev. Rul. 68–232, 1968–1 C.B. 79. The majority, however, distinguishes nondepreciable works of art on the ground that they are not used "actively, regularly, and routinely" to produce income in a trade or business. Majority op. p. 294. The statutory source of that test is unidentified. Perhaps the majority is simply indulging in the presumption that, for want of active, regular, and routine use, works of art have an indefinite useful life. If so, then I fail to see why useful life (i.e., the determinability thereof) is not a question of fact here to be proven by petitioners.

## Not a Clean Slate

Congress did not write on a clean slate when it added section 168 to the Code. The slate already contained section 167, which, with respect to the aspect at issue, Congress left unmodified. In effect, Congress added section 168 on top of section 167. If active, regular, and routine use are to replace determinable useful life as the touchstone for depreciability, then I believe that the majority has opened a loophole that it is inconceivable Congress intended. What is to stop wealthy taxpayers from stuffing (indeed, overstuffing) their offices with valuable antique furniture that they may write off over the 7-year recovery period now applicable to office furniture? In Noyce v. Commissioner, 97 T.C. 670, 688 (1991), we rejected the notion that depreciation deductions must be reasonable in amount. Now, as long as the property is regularly (and actively) used for business purposes, we decide to turn a blind eye to its utility as a (valuable) collectible. It seems to me that we—and not Congress—have declared a field day for purveyors of fine antique furniture and other dual-purpose collectibles. It is our job to interpret the statutes as Congress wrote them and not to interpret them as if we had written them. The latter is what I fear the majority has done, and I cannot join that effort. For that reason, I dissent.

HAMBLEN, CHABOT, JACOBS, and WHALEN, JJ., agree with this dissent.

BEGHE, *J.*, dissenting: Having concurred in the result of the companion case, *Simon v. Commissioner,* 103 T.C. 247, 267 (1994) (Beghe, J., concurring), I respectfully dissent in this case. I believe the holdings of the trial judges in these two cases can be harmonized on a narrower ground, and I would uphold the findings and holdings of Judge Laro in *Simon* and of Special Trial Judge Powell in this case. The differences in the findings of fact in the two cases make it unnecessary to adopt either the broadly stated interpretation of section 168 set forth in the majority opinions, or the overly restrictive views espoused by the dissents.

Judge Laro, the trial judge in *Simon,* found that the Tourte bows actually did and do suffer substantial wear and tear that will render them unplayable over some indeterminate time. The bows are therefore subject to exhaustion that arguably characterizes them as "property of a character subject to the allowance for depreciation." On the other hand, Special Trial Judge Powell, whose findings of fact in this case were adopted by Judge Laro and the majority that rejected Special Trial Judge Powell's proposed contrary holding, not only concluded that the bass viol did not have a "determinable useful life", but in so doing found that the bass viol had not suffered such wear and tear as would lead to any curtailment of its useful life as a playable instrument.

I am puzzled by the Chief Judge's aspersions on "some findings of fact" of Judge Laro, as adopted by the majority in *Simon v. Commissioner, supra* at 268 (Hamblen, C.J., dissenting); see also *id.* at 276–280. These aspersions are unnecessary to support the dissenters' bottom-line interpretation of section 168 in these cases; even if they are well founded,[1] they do not require a different result in *Simon*

---

[1] In my view, the total testimony in *Simon v. Commissioner,* 103 T.C. 247 (1994), including that of respondent's expert witness Wiley Grant, amply supports Judge Laro's finding that the Tourte bows suffered substantial wear and tear. First, Mr. Simon testified that: (1) The vibration of the wood on the Tourte bows resulted in wear and tear on the bows, Tr. at 15–16; (2) Tourte bows in general "play out" (meaning they lose their usefulness as adjuncts to stringed musical instruments), Tr. at 22; (3) regular playing with any bow results in substantial wear and tear to the bow, Tr. at 34–35; and (4) the Tourte bows were not in the same pristine condition today as when petitioners had purchased them, due to use in their profession, Tr. at 60. Second, Yung Chin testified that: (1) The Tourte bows were not in the same condition at the time of trial as they had been on the date that he had appraised them, Tr. at 103, 113, 121; (2) "the stick is getting worn down somewhat on the stick itself, meaning there is wood that has come off of it", Tr. at 104; (3) "the stick[s of the Tourte bows are] being worn down somewhat, which you cannot repair", Tr. at 121; (4) he noticed defects in both of the Tourte bows, Tr. at 121–122; and (5) "there is a slight amount of use shown on the handle of the bow", Tr.

under the "clearly erroneous" standard for review of the findings of fact of a trial judge. See *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir. 1993), affg. T.C. Memo. 1992–269. This is because they do not impair what I take to be Judge Laro's finding of ultimate fact in *Simon,* as described in the first sentence of the immediately preceding paragraph.

The arguments for bifurcating the cost of dual-use property might well deserve respectful attention, but in some other case. In the current procedural posture and state of the record of these cases, there is no ground for considering bifurcation. Respondent went for all or nothing, totally disallowing cost recovery allowances under section 168 for tangible business property that can also be characterized as collectibles or works of art. Petitioners therefore cannot be faulted for failing to offer evidence to support allocation of their costs between the recoverable and nonrecoverable elements, nor should the majority opinions be criticized for not considering bifurcation. In any event, I would not adopt the bifurcation approach; to do so would reintroduce administrative problems that section 168 is intended to minimize.

---

at 123. Finally, Wiley Grant, respondent's expert, conceded that playing the Tourte bows reduces their value to a professional musician. Tr. at 145–146.