T.C. Memo. 1995-519


UNITED STATES TAX COURT


THOMAS L. HOBART, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25649-93.        Filed October 30, 1995.


Gregory Daniel Smith, for petitioner.

Linda J. Wise, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined a deficiency in the amount of $132,675 in petitioner's Federal income tax for 1988 and an addition to tax pursuant to section 6653(b)(1) in the amount of $101,783.  Respondent asserted the delinquency and negligence additions to tax under sections 6651(a)(1) and 6653(a)(1), respectively, in the alternative to the fraud addition to tax.  Unless otherwise noted, all section references

are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether petitioner had unreported income in 1988 and, if so, in what amount and (2) whether petitioner is liable for the fraud addition to tax for 1988 or, in the alternative, the delinquency and negligence additions to tax.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, petitioner resided in Pensacola, Florida.

Petitioner met Linda Nelson (Nelson) around 1987, and they became engaged to marry. After their engagement, petitioner encouraged Nelson to quit her job so that she would have more time to make wedding plans. Petitioner promised Nelson that he would make sure she had access to funds to cover her expenses. Petitioner and Nelson were married in September 1988. Nelson filed for divorce in March 1989, and the divorce was final July 2, 1990.

During 1988, petitioner was employed by Zebrowski and Associates, Inc. (Zebrowski). Zebrowski was engaged in the demolition business. Edward Timothy Sullivan (Sullivan) was the

owner and president of Zebrowski. Petitioner was in charge of the day-to-day operations of Zebrowski's Gulf Coast Division.

Zebrowski sold the scrap from its demolition jobs to scrap companies, including Southern Scrap (Southern). Demolition companies and other scrap producers would deliver scrap to Southern. The scrap would be weighed, and a scale ticket would be issued indicating the type and the weight of the scrap. The scrap seller would take the scale ticket to Southern's office to request payment. Southern made payments for scrap by both check and cash. Often, a seller requested a large cash payment when Southern had insufficient cash available in its office. When this occurred, Southern would make a check payable to Barnett Bank for the appropriate amount and an employee would go to Barnett Bank to cash the check. The cash would be brought back to Southern, counted, and distributed to the scrap seller.

When Zebrowski began selling scrap to Southern, the payments were made by check and mailed to Zebrowski's Michigan office. This procedure changed, however, at some point in 1988. Southern's payments for Zebrowski scrap then included checks made payable to petitioner and to Nelson, as well as cash.

During 1988, numerous checks were issued by Southern in payment for Zebrowski scrap. Approximately 41 checks were issued payable to petitioner by Southern in payment for Zebrowski scrap. At least 17 Southern checks were made payable to Nelson. Many of these checks were deposited into a joint bank account maintained

by petitioner and Nelson. Because of Southern's practice of cashing checks payable to Barnett Bank in order to make cash payments for scrap, 32 cash payments for Zebrowski scrap during 1988 are indicated by 32 checks payable to Barnett Bank. These checks correspond with various scale tickets relating to Southern's purchase of Zebrowski scrap. These cash payments were delivered to petitioner by Southern employees.

Petitioner often handled personal transactions in cash, although he claimed during an interview with a revenue agent to keep only $100 in cash on hand at any given time. Nelson's engagement ring was purchased with approximately $8,000 in cash.

During 1988, petitioner used a combination of cash and credit cards to take Nelson on a $10,000 shopping spree. Nelson's $7,000 wedding dress was paid for by petitioner. Petitioner paid various wedding expenses totaling approximately $13,000, including the reception, lodging for some guests, the cost of tuxedo rentals for the groomsmen, and the cost of several bridesmaids' dresses. The couple took a honeymoon trip to Puerto Vallarta, where they purchased approximately $1,500 of jewelry. Petitioner bought Nelson's daughter a car. Before moving into their own home, petitioner and Nelson lived in a hotel suite that cost $1,800 per month for approximately 3 months in 1988. On October 14, 1988, petitioner and Nelson purchased a 1.41-acre lot, paying $500 as a deposit, $12,500 at the closing, and the balance as a deferred note. Funds from the joint bank account

were used to pay various expenses, including credit card bills, doctors' bills, car payments, groceries, traveler's checks for the honeymoon, and legal expenses for a business in which petitioner was involved.

On September 25, 1989, a one-count information was filed in the Circuit Court of Escambia County, Florida, charging petitioner with theft of property valued at over $100,000. The charges stemmed from petitioner's misappropriation of Zebrowski funds. Also on September 25, 1989, a three-count information was filed charging petitioner with check forgery, uttering forged instruments, and theft of property valued between $300 and $20,000. This information related to petitioner's forgery of a check in the amount of $5,695 made payable to Sullivan. Both informations related to petitioner's activities between January 1, 1988, and March 31, 1989. The charges against petitioner carried a possible jail sentence of over 30 years. All charges against petitioner were consolidated for trial. The jury returned verdicts of guilty on all counts. On April 11, 1990, the court entered its judgment and sentence in petitioner's case. Petitioner was placed on probation for 20 years, directed to perform 50 hours of community service for each year of probation, and ordered to pay court costs of $284.50 and to pay restitution of $446,571. Zebrowski subsequently filed a civil suit seeking restitution relating to petitioner's criminal

convictions.  Summary judgment was entered in favor of Zebrowski on March 2, 1993.

Petitioner's 1988 Federal income tax return was filed on July 19, 1991.  Petitioner filed in 1988 using single status but has since conceded that his filing status should have been married.  Petitioner reported income of $31,400 from wages, salaries, tips, etc., on his return, as well as $218 of taxable interest income.  Petitioner did not include any of the funds he had misappropriated from Zebrowski in his income reported for 1988.

The Internal Revenue Service (IRS) began an investigation of petitioner during 1992.  Petitioner failed to provide any income records other than four or five bank statements and a copy of a tax return in response to IRS document requests.

OPINION

Unreported Income

Respondent has argued that the doctrine of collateral estoppel bars petitioner from denying the receipt and the amount of unreported income set forth in the notice of deficiency. Because of the lack of identity of issues and uncertainty of when the misappropriated amounts determined in the prior litigation were taken, the application of collateral estoppel in this case is problematic.  Detailed analysis of that issue is less

efficient than simply deciding the case on the evidence otherwise in the record.

Under section 61, gross income includes "all income from whatever source derived."  It is well established that stolen funds are includable in the year in which they are misappropriated.  James v. Commissioner, 366 U.S. 213, 219-220 (1961); Lydon v. Commissioner, 351 F.2d 539, 545 (7th Cir. 1965), affg. T.C. Memo. 1964-27.

As a general rule, petitioner has the burden of proving that respondent's determination is erroneous.  Rule 142(a); Webb v. Commissioner, 872 F.2d 380, 381 (11th Cir. 1989), affg. T.C. Memo. 1988-80.  In cases involving unreported income, the Court of Appeals for the Eleventh Circuit has stated that the deficiency determination must be supported by "some evidentiary foundation linking the taxpayer to the alleged income-producing activity."  Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993) (quoting Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977)), affg. T.C. Memo. 1991-636.  The required showing is minimal.  Carson v. United States, 560 F.2d 693, 697 (5th Cir. 1977).  The evidence here clearly connects petitioner to the receipt of funds diverted from Zebrowski.  Thus, petitioner must show that the amount of unreported income determined by respondent is excessive.

Petitioner argues that the indictment under which he was convicted related to activities during 1988 and 1989.  Because

the 1989 tax year is not before the Court, petitioner asserts that respondent cannot rely on petitioner's conviction to establish theft activity during 1988. The evidence presented at trial, however, demonstrates that petitioner was involved in theft activity during 1988. In order to misappropriate Zebrowski funds, petitioner used his position with Zebrowski to request changes in the way Southern paid for Zebrowski scrap. Instead of having Southern make the checks payable to Zebrowski and mailing the payments to the Michigan office, petitioner requested that payment be made by checks payable to petitioner or Nelson. During the trial, respondent introduced 58 Southern checks dated during 1988 made payable to petitioner or Nelson that represent payments for Zebrowski scrap. Petitioner also requested that Southern make cash payments for Zebrowski scrap. As was Southern's practice, large cash payments were often obtained from checks made payable to Barnett Bank. Respondent introduced 32 Southern checks made payable to Barnett Bank during 1988 that represented payments for Zebrowski scrap. Testimony at trial indicated that petitioner was the recipient of these cash payments.

Petitioner produced no reliable evidence at trial to show that respondent's determination is incorrect. Although petitioner initially denied the receipt of any unreported income, in the alternative, petitioner asks us to include in his income only those amounts that are represented by checks payable to him.

We reject this argument, because he controlled all of the misappropriated funds.

Petitioner asserts that a number of individuals, including Sullivan, Nelson, and Southern employees, received the funds in question. Sullivan denied receiving any of the proceeds from the Southern checks. Although from the record none of the witnesses seems completely innocent, the preponderance of the evidence is that Sullivan was a victim of petitioner's misappropriation. Petitioner was convicted not only of misappropriating funds from Sullivan's company, Zebrowski, but also of forging the endorsement on a check payable to Sullivan. Sullivan, on behalf of Zebrowski, filed a civil suit seeking restitution from petitioner. Petitioner produced no evidence in support of his contention that other Southern employees received some of the funds in question.

Petitioner argues that the checks payable to Nelson should not be included in his income. "The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income by him who exercises it." Helvering v. Horst, 311 U.S. 112, 118 (1940). A taxpayer is not relieved of the obligation to pay taxes on income merely by a transfer of that income to another. United States v. Basye, 410 U.S. 441, 449-451 (1973). Petitioner was the "force and fulcrum" behind the thefts that made the benefits to Nelson, as well as

petitioner, possible.  See <u>Davis v. Commissioner</u>, T.C. Memo. 1991-333.

Petitioner has failed to offer any credible evidence that he did not receive the amounts determined by respondent. Respondent's determination of the deficiency will be sustained.

<u>Fraud</u>

The 75-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud.  Sec. 6653(b)(1); <u>Helvering v. Mitchell</u>, 303 U.S. 391, 401 (1938).  Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment for 1988 was due to fraud.  Sec. 7454(a); Rule 142(b).  This burden is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of such taxes.  <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968); <u>Webb v. Commissioner</u>, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  Once the Commissioner has established that some portion of an underpayment is due to fraud, the entire underpayment is treated as attributable to fraud unless the taxpayer can show that some portion of the underpayment is not due to fraud.  Sec. 6653(b)(2).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may be proved, however, by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Spies v. United States, 317 U.S. 492, 499 (1943); Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

The following facts that indicate fraud in this case have been established by clear and convincing evidence: (1) Petitioner's misappropriation of funds from Zebrowski (see, e.g., Solomon v. Commissioner, T.C. Memo. 1982-603, affd. 732 F.2d 1459 (6th Cir. 1984)); (2) petitioner's understatement of his taxable income by failing to report the misappropriated funds on his 1988 return (see Davis v. Commissioner, supra); (3) petitioner's frequent dealings in cash (Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Petzoldt v. Commissioner, 92 T.C. 661, 702 (1989)); (4) petitioner's implausible denial of the receipt of the misappropriated funds and failure to explain expenditures that far exceeded his reported income (see, e.g., Bahoric v. Commissioner, 363 F.2d 151, 153 (9th Cir. 1966), affg. T.C. Memo.

1963-333); and (5) petitioner's failure to provide complete and accurate income records to the tax authorities (<u>Grosshandler v. Commissioner</u>, 75 T.C. 1, 20 (1980)).

Because respondent has proven by clear and convincing evidence that some portion of the underpayment is due to fraud, the burden is on petitioner to prove the amount of the underpayment not attributable to fraud. Petitioner has stated two arguments in this regard: (1) That he did not receive any of the stolen funds or (2) that, if he did receive any of the funds, his unreported income was only in the amount of the Southern checks payable to him. We have rejected both of these arguments.

Respondent's determination regarding the addition to tax for fraud will be sustained. Because we have upheld respondent's fraud determination, we need not examine the alternative additions to tax asserted by respondent.

<u>Decision will be entered for respondent</u>.