IRVING NITZBERG and IDA NITZBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent SID MILLER and HELEN MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Nitzberg v. Commissioner
Docket Nos. 1327-73, 1360-73.
United States Tax Court
T.C. Memo 1975-154; 1975 Tax Ct. Memo LEXIS 218; 34 T.C.M. (CCH) 707; T.C.M. (RIA) 750154; May 21, 1975, Filed Stephen J. Schwartz and Charles A. Lane, for the petitioners. Edward B. Simpson, for the respondent. GOFFE
MEMORANDUM OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax as follows: Docket
Taxable Number
Petitioners
Year
Deficiency
1327-73
Irving and Ida Nitzberg
1968
$1,126.00
1360-73
Sid and Helen Miller
1968
1,981.59 The cases have been consolidated for trial, briefs and opinion. The issue for decision is whether the amounts paid by the Avalon Club partnership for "shills" were deductible under either section 162 or section 212, or whether such amounts constituted net wagering losses not deductible under section 165(d). [1]
All of the facts are stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated by this reference. *220 At the time of the filing of their petition, Irving and Ida Nitzberg, husband and wife, resided in Oakland, California. They filed a joint Federal income tax return for the taxable year 1968 with the District Director of Internal Revenue, San Francisco, California. Likewise, Sid and Helen Miller, husband and wife, resided in Oakland, California, at the time of the filing of their petition. They also filed a joint Federal income tax return for the taxable year 1968 with the District Director of Internal Revenue, San Francisco, California. In June of 1967, Irving Nitzberg and Sid Miller began a partnership as equal partners in the operation of the Avalon Club, hereinafter referred to as club. The club was located in Emeryville, California. In 1968 Nitzberg and Miller admitted Gene Viola as a partner. The club operated a card room with 13 tables available to patrons to play the games of Draw Lo-Ball and Pan. Of the 13 tables, 8 to 10 tables operated on a regular basis with 1 or 2 operated as Pan tables and 8 or 9 operated as Draw Lo-Ball tables. The club was open for business from 10 a.m. to 2 a.m. 7 days a week until June of 1968 when the partnership ceased operation of the club. *221 The game of Draw Lo-Ball is a gambling activity and a form or variety of draw poker. The basic game is played whereby each player receives 5 cards face down and each player may at his option discard up to 3 cards and receive an equal number of replacement cards from the deck. Bets are made by the players at intervals and, consistent with the established hierarchy of values in poker, the lowest value wins. The game of Pan is a gambling activity and a form or variety of rummy. The game is played with 8 decks of cards and each player is dealt 10 cards. The players successively can draw replacement cards from the deck and make bets. The first player to secure certain predetermined combinations of cards is the winner. In general, those combinations are like the combinations required under the rules of rummy. The games of Draw Lo-Ball and Pan conducted in the club were legal in all respects. The club paid a license fee to the City of Emeryville with respect to the conduct of the card room business. In order for a patron of the club to play at the Lo-Ball tables, he had to pay a fixed, per hour rental or seat charge to the club. The hourly rate depended upon what the established minimum *222 or maximum bet was for that particular game or series of games. One-half of the fixed, hourly rental was collected from the patrons at half-hour intervals. Likewise, for a patron to play Pan, he and the other players had to pay a rental or seat charge by placing $1 or more depending upon the stakes, in the pot at the beginning of each hand and the club would then remove $1 or more, depending upon the stakes, for the club as a rental charge for playing the game. The amount of table rental was determined by the stake of the game; for example, in Lo-Ball: $30 limit game
Table rental $5 per hour per
player
$20 limit game
Table rental $4 per hour per
player
$10 limit game
Table rental $3 per hour per
player
$6 limit game
Table rental $2.50 per hour
per player
$4 limit game
Table rental $2 per hour per
player
$2 limit game
Table rental $1.25 per hour
per player In the Pan games the ante was generally $1, $2 or $5 per player. In both Lo-Ball and Pan, most of the play was at lower stakes. In addition to the rental seat charge, the club prepared and sold food and nonalcoholic beverages to its patrons at nominal prices. For the period January 1, 1968 to *223 the termination of the partnership, the partnership reported gross income of $96,710 which consisted solely of the rental seat charges made with respect to Lo-Ball and Pan and the sale of food and beverages. The greater part of the gross income was derived from the Lo-Ball charge. A small amount of the gross income, not exceeding $7,000, was derived from the sale of food and beverages. It was important and fundamental to the card room business conducted by the club that patrons who desired to play Lo-Ball or Pan find a game open to them for their play. In order to have a sufficient or satisfactory number of players to start a game or to keep a game going, depending upon the circumstances, the club engaged "shills." In connection with the card room business conducted by the club, shills were engaged with considerable frequency by the club and their activity contributed significantly to the incomeproducing activities of the club. The club engaged shills under an arrangement whereby the club would turn over a certain sum of money (or money's worth in chips) to the shill to play in Lo-Ball or Pan for a period of time which depended upon the circumstances. At the end of the period of *224 play of the shill, he would account to the club. If he had less in money (or money's worth in chips) than the club had turned over to him for purposes of commencing play, he would return to the club that amount. Any loss would be entirely absorbed by the club. On the other hand, if the shill had more money (or money's worth in chips) at the end of his period of play than was originally turned over to him, he would return to the club the amount originally turned over to him, plus one-half of any amount over and above the amount originally advanced to him. The shill was then entitled to retain the remaining one-half of the gains as his own. The shills received no other money from the club and they were not treated as club employees for any purpose. The shills were required to pay table rentals as were all players. They were instructed by the club to play conservatively and to keep the game going, but the extent to which such instructions were followed is not known. They were further instructed by the club to leave a table to make room for a patron, as circumstances would dictate, whether the shill was winning or losing. On a daily basis, the club maintained an accounting of the amounts *225 turned over to the shills and the amounts the shills returned. For the period from January 1, 1968 to the termination of the partnership in June of 1968, the shills returned to the club a total of $15,858 less than the club had turned over to them which the club claimed as a "promotional" expense on its 1968 partnership return. One thousand five hundred dollars of the $15,858 represents the total amount that the shills paid the Club in seat rentals in the course of their play and is conceded by respondent to be deductible. [2] The balance of $14,358 is the amount in issue and represents the net amount the club lost as a consequence of the shills' Lo-Ball and Pan gaming play. In his statutory notices of deficiency, the Commissioner disallowed the promotional expense on grounds that it did not qualify for deduction as an ordinary and necessary business expense and because it represented losses from wagering. Other adjustments made by the Commissioner in his statutory notices of deficiency have been settled. Petitioners contend that the $14,358 *226 is either a section 162(a) ordinary and necessary business expense or a section 212 expense incurred in connection with a transaction engaged in for profit. They further contend that the limitation of section 165(d) allowing the deduction of wagering losses only to the extent of wagering gains is not controlling because the club did not engage in wagering. Further, if the $14,358 is characterized as a wagering loss, the table rentals ($89,000) should be recharacterized as wagering gains thus offsetting in full the losses. Beyond statutory authority, petitioners rely solely on Commissioner v. Sullivan,356 U.S. 27 (1958). Respondent contends that "the Club, through its arrangement with the shills, was an active participant in the gaming activity." He directs our attention to Skeeles v. United States,95 F.Supp. 242 (Ct.Cl. 1951), cert. denied 341 U.S. 948 (1951); Humpherey v. Commissioner,162 F.2d 853 (5th Cir. 1947), cert. denied 332 U.S. 817 (1947); Roy T. Offutt,16 T.C. 1214 (1951). The presumptive correctness of the Commissioner's determination places the burden of proof upon petitioners *227 to show deductibility. Rule 142(a), Tax Court Rules of Practice and Procedure. The facts do not support a finding that the payments were ordinary within the meaning of section 162. The payments were clearly necessary in that it was appropriate to provide an open game for patrons which was, in turn, helpful to developing and maintaining patronage. Welch v. Helvering,290 U.S. 111, 113 (1933). But there is nothing in the record or within the sphere of our judicial notice suggesting that such payments, or payments similar in nature and purpose, were customary in such gaming business. Fontana Power Co. v. Commissioner, 127 F.2d 193, 195 (9th Cir. 1942), affg. 43 B.T.A. 1090 (1941).There is no evidence to support a finding that the use of shills or similar endeavors were common or frequent in the type of business involved. The test is normalcy in the particular type of business, as opposed to the specific business of the club. Deputy v. DuPont,308 U.S. 488 (1940). Petitioners' alternative position that the payments are deductible by the club under section 212 must be rejected upon reading section 703(a)(2)(F) which states: *228 SEC. 703. PARTNERSHIP COMPUTATIONS. (a) INCOME AND DEDUCTIONS.--The taxable income of a partnership shall be computed in the same manner as in the case of an individual except that-- * * * * * (2) the following deductions shall not be allowed to the partnership: * * * * * (F) the additional itemized deductions for individuals provided in part VII of subchapter B (sec. 211 and following). As a final matter, we reject petitioners' request to recharacterize the seat rental charges as wagering gains and thereby allowing the wagering losses to be netted. The facts clearly support a contrary finding. Reliance upon Commissioner v. Sullivan,supra, is misplaced without a showing in the first instance of deductibility under section 162. Because we decide the issue for respondent, it is unnecessary to consider his alternative grounds. Decisions will be entered under Rule 155.
Footnotes
1. All Code references are to the Internal Revenue Code of 1954, unless otherwise noted.↩
2. Respondent did not explain the concession. It is probably more consistent to consider the seat rentals as excludable from income.↩