William W. BOYD and Ruth G. Boyd, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 84–1828.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 17, 1985.

Decided June 14, 1985.

Monte N. Stewart, Wright, Shinehouse & Stewart, Las Vegas, Nev., for plaintiffs-appellants.

Laurie A. Snyder, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before FLETCHER, BOOCHEVER and NORRIS, Circuit Judges.

BOOCHEVER, Circuit Judge:

Boyd, a professional poker player, managed the cardroom at a casino and played in the games himself to attract customers. Boyd brought a refund claim in the district court, seeking to deduct as business expenses his poker losses, his contributions to the house take or "take-off" on each hand, and his tipping expenses. In the alternative, he contended that his contractual share of the house take was wagering income and that he could offset his poker losses against that income. We hold that Boyd's contractual share of the take-off was not gain from wagering transactions, and that he did not adequately raise the business expense deductions in his refund claim. We therefore affirm the district court's denial of his refund claim.

## FACTS

Boyd, a renowned professional poker player, ran the poker room at the Golden Nugget Casino in Las Vegas from 1946 to 1982. Pursuant to his contract, Boyd played in the games himself to attract customers and stimulate play. He did so with his own money. He alleges that because his duties as manager disturbed his concentration at the table, he sustained heavy gambling losses during his employment. He also spent a considerable amount of money tipping other employees, and paying his share of the house take-off on each hand.

Boyd's contract had an incentive clause awarding him a portion of the take-off in the card room. Take-off is the fee the house charges card players for playing poker at the casino. Take-off at the Nugget is computed in one of three alternate ways: a seat charge per hour, a table charge per hour, or a pot fee of the lesser of ten percent or three dollars per pot. The house is not a participant in the game. In essence, it makes its money on poker by renting its facilities to the players.

For the tax years 1973, 1974, and 1975, Boyd reported his salary plus his share of the take-off as wages, and claimed deductions for gaming expenses. The Internal

Revenue Service (IRS) disallowed the deductions. Boyd paid the resulting deficiencies and filed claims for refunds. Each claim stated the following:

During the year [1973, 1974, 1975] William W. Boyd was employed by the Golden Nugget Casino in Las Vegas, Nevada as a Supervisor and Director of the casino poker game room. Under the terms of his employment he was required to be an active participant in the poker game under his control. His presence and participation in the poker game generated interest among other poker players due to his name and reputation. The direct result of his participation increased the poker play and in turn increased his income under his employment agreement.

For the year [1973, 1974, 1975] Mr. Boyd incurred losses from participating in the Golden Nugget Casino poker games in the amount of [$94,200, $40,-000, $153,400]. This expense is clearly a business promotional and advertising expense deductable [sic] under Section 162(a) of the 1954 Internal Revenue Code.

In the alternative, Mr. Boyd contends that his incentive compensation is gambling income and the losses that he sustained should be allowed as a deduction up to the amount of the incentive income.

The IRS disallowed the claims for refund, and Boyd sued in district court.

At trial, Boyd sought to prove three types of deductible expenses: expenses incurred in tipping other employees, expenses incurred in contributing to the house take-off when he played poker at work, and his losses incurred playing poker at work. The court ruled, however, that Boyd's refund claim did not sufficiently apprise the IRS that he would be claiming tipping and take-off expenses, and that Boyd could not raise these issues for the first time in the district court. The district court also ruled against Boyd on his claim that he could deduct his poker losses, either as business expenses, or as gaming losses offset against his gains from his contractual share of the take-off.

Each issue in this case involves the construction of a statute in the context of undisputed facts; the standard of review as to all questions presented is de novo. *Southeast Alaska Conservation Council, Inc. v. Watson,* 697 F.2d 1305, 1309 (9th Cir.1983).

## I. ADEQUACY OF REFUND CLAIM

Section 7422(a) of the Internal Revenue Code[1] provides:

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed ... until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

The regulations promulgated under section 7422(a) state, "The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas.Reg. § 301.6402–2(b)(1). If the refund claim does not meet the requirements of the Code and the regulations, the suit must be dismissed, *L.E. Myers Co. v. United States,* 673 F.2d 1366, 1367, 230 Ct.Cl. 142 (1982), because filing pursuant to the rules is a jurisdictional prerequisite, *Martinez v. United States,* 595 F.2d 1147, 1148 (9th Cir.1979) (per curiam); *Bear Valley Mutual Water Co. v. Riddell,* 493 F.2d 948, 951 (9th Cir.1974).

There are two reasons for these requirements: to prevent surprise, and to give the IRS adequate notice of the claim and its underlying facts so that it can make an administrative investigation and determination regarding the claim. *Burlington Northern Inc. v. United States,* 684 F.2d 866, 868, 231 Ct.Cl. 222 (1982). Although courts have not required taxpayers to pro-

---

**1.** All references to the Code are to the Internal Revenue Code of 1954 as amended and applica-

ble to the taxable years 1973, 1974, and 1975.

vide detailed explanations of their legal theories, or to develop full factual backgrounds in their refund claims, *Lemoge v. United States*, 378 F.Supp. 228, 232–33 (N.D.Cal.1974), the IRS is entitled to take the refund claim at face value and examine only the points to which it directs attention, *United States v. Garbutt Oil Co.*, 302 U.S. 528, 531–33, 58 S.Ct. 320, 322–23, 82 L.Ed. 405 (1938). If the claim on its face does not call for investigation of a question, the taxpayer may not later raise that question in a refund suit.

■ In his claim, Boyd stated that he "incurred losses from participating in the [casino] poker games" and that "[t]his expense" was deductible under section 162(a).[2] "This expense" plainly refers to the poker losses, and nowhere does the claim mention tipping or take-off fees. Taken at its face value, Boyd's claim directed the IRS' attention to losses incurred betting on poker hands, and nothing else. Moreover, the wording of Boyd's alternative theory strengthens this impression. It refers to section 165(d), which provides that wagering losses may be deducted only up to the amount of wagering gains, reinforcing by implication the claim's express statement that the losses for which deduction was sought were actual wagering losses, not other unspecified expenses incidental to gambling which would not be subject to the section 165(d) deduction limit.

Boyd's claim did not adequately apprise the IRS so that it could " 'make an intelligent administrative review of the claim.' " *Lemoge*, 378 F.Supp. at 232 (citation omitted). Nothing in the claim notified the IRS that it needed to investigate how much Boyd had expended in tips, or how much he contributed to the take-off. Moreover, nothing in the claim apprised the IRS that it should be prepared to argue, as a matter of fact or law, whether take-off paid by a player is a part of the wager or a separate fee, or whether lavish tipping of subordinate employees as an example to customers is an ordinary and necessary business expense. We hold that Boyd's claim did not adequately raise the tipping and take-off expenses.

## II. BOYD'S LOSSES

Boyd sought to deduct his poker losses as an ordinary and necessary business expense under section 162(a). Although Boyd's refund claim properly raised this issue, the district court denied the deduction, holding that a specific code provision limiting deductibility of gambling losses controlled rather than the general provisions of section 162(a).

This case is controlled by our decision in *Nitzberg v. Commissioner*, 580 F.2d 357 (9th Cir.1978). In *Nitzberg*, a gaming club employed shills to play in the card games when insufficient customer-gamblers were playing. The club provided the shills with chips. If a shill lost, the club absorbed the loss. If he won, he split his winnings evenly with the club. In the tax years at issue, the shills as a group lost more than fifty percent of their winnings, so the club had a net loss, which it sought to deduct as a section 162(a) business expense. *Id.* at 358.

We held that although on the facts the losses were an ordinary and necessary business expense within the meaning of section 162(a), section 165(d) precluded deduction. That section provides that "losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." Because the shills were betting with the club's money, and the club shared in each win or loss, the club was engaged in wagering transactions, and section 165(d) was applicable. *Id.* To resolve the conflict between 162(a) and 165(d), we looked to the rule that a specific statute controls a general statute. *See United States v. Bates*, 429 F.2d 557, 559 (9th Cir.), *cert. denied*, 400 U.S. 831, 916, 91 S.Ct. 61, 175, 27 L.Ed.2d 61, 155 (1970). Section 162(a) deals with all business expenses, whereas 165(d) specifically addresses gambling. losses. Section 165(d) therefore controls, and a gambling loss, al-

---

**2.** Section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or in-
curred during the taxable year in carrying on any trade or business."

though it may be a business expense, is deductible only to the extent of gambling gains. *Nitzberg,* 580 F.2d at 358; *accord Skeeles v. United States,* 95 F.Supp. 242, 246–47, 118 Ct.Cl. 362 (analyzing legislative history of section 23(h), predecessor of section 165(d), and noting that Congress apparently intended no distinction between professional gamblers and occasional gamblers), *cert. denied,* 341 U.S. 948, 71 S.Ct. 1014, 95 L.Ed. 1371 (1951).

▪ Boyd's losses at issue here are indubitably losses from wagering transactions, and section 165(d) therefore controls even if the losses are also business expenses within the meaning of section 162(a). Because Boyd has already netted his losses with his gains, the deductions he seeks are for losses in excess of his gains from wagering, and are prohibited by section 165(d).

### III. BOYD'S SHARE OF THE TAKE-OFF

As an alternative position, Boyd argues that his share of the take-off was gain from wagering transactions, against which he is entitled to deduct his excess losses under section 165(d). Neither the Code nor the regulations define the term "gains from wagering transactions" as used in section 165(d). In interpreting the phrase, therefore, the court should give the words their ordinary meaning. *Greyhound Corp. v. United States,* 495 F.2d 863, 869 (9th Cir.1974) (construction of revenue provision). The IRS argues that the phrase means gain from a wagering transaction entered into by the taxpayer. Boyd argues that it means gain flowing to the taxpayer from a wagering transaction, whether as a participant or as the house taking a table rental. While there is no controlling authority, the IRS position is more persuasive.

Although *Nitzberg* did not specifically address whether take-off income is gain

from wagering transactions under section 165(d), the opinion does base its holding that the club's losses fall within section 165(d) on the fact that the club, through the shills, was itself participating in wagering transactions. *Nitzberg,* 580 F.2d at 358. If the test for loss or gain within section 165(d) is whether one participates in wagering transactions, nonparticipation takes the loss or gain out of the section. Moreover, *Nitzberg,* without discussing the issue, appears to treat take-off as seat rental and not as wagering gains against which the club's wagering losses could be offset. *See Nitzberg,* 580 F.2d at 358; *id.* at 359 (Sneed, J., dissenting on other grounds); *Nitzberg,* T.C.M. 1975–154, 34 T.C.M. (CCH) 707, 710 (explicitly rejecting club's alternative argument that take-off is wagering gain under section 165(d) ).

In *Williams v. Commissioner,* T.C.M. 1980–494, 41 T.C.M. (CCH) 312, taxpayers were dealers who sought to characterize "tokes" given them by players as gains from wagering transactions against which they could offset gambling losses. The dealers contended that because the tokes generally were the result of a winning bet placed by the player "for the dealer," they were gains from wagering. The Tax Court held to the contrary. Any amount bet by the player for the dealer remained under the player's control, by state law and casino policy, until the winnings, if any, were given to the dealer.[3] The player, not the dealer, entered into the wagering transaction. Gain to the dealer as a result of the wager was therefore not gain from a wagering transaction entered into by him, and could not be offset against gaming losses. *Id.* at 314. Applying the Tax Court's reasoning to this case, Boyd's take-off share is not gain from wagering transactions entered into by him, and therefore is not gain within the meaning of section 165(d).

▪ Boyd asks this court to look to Nevada law for the definition of gains from

---

**3.** Under state law and casino rules, dealers were not allowed to place bets for themselves at their own table. Even if a player placed a bet and said it was for the dealer, the dealer could not

pick up the bet before the cards were played. Moreover, if the player won, he was indisputably entitled to keep the winnings rather than give them to the dealer.

wagering transactions. As a general rule, however, federal law controls the meaning of words in federal revenue statutes in the absence of language evincing a different purpose. *Estate of Steffke,* 538 F.2d 730, 732 (7th Cir.), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 624 (1976). Even if we were to consider Nevada law, it would not support Boyd's contention. Nevada gaming statutes do not use the phrase "gain from wagering transactions." Moreover, Nevada law distinguishes between casino winnings derived from games in which the house is a participant and income received as compensation for conducting a game in which the house is not party to a wager, i.e. take-off income. *See* Nev.Rev. Stat. § 463.0161 (1983) (defining "gross revenue").[4]

■ The take-off income in which Boyd contractually shared was compensation received by the house for conducting games in which the house was not a party to the wagers. It was, in essence, a fee charged the players for the use of house facilities. It was not gain from wagers entered into by the house or Boyd, and therefore Boyd may not offset losses on wagers entered into by him against it under section 165(d).

The opinion of the district court is AFFIRMED.

---

**4.** Boyd argues that because Nevada Gaming Board Regulations, under the heading "Procedure for reporting winnings," include take-off income in gross revenue, Nevada law establishes that take-off is "winnings," which Boyd contends are the same thing as gain from wagering transactions under federal law. *See* Nev. Gaming Bd.Reg. § 6.080(1) (1983). However, Nevada's statutory scheme is aimed at determining the gross revenue of casinos from their gambling operations. The federal statute is aimed at forcing individual gamblers to report gambling gains by limiting deduction of gambling losses to the extent of gambling gains. *See* H.R.Rep. 704, 73d Cong., 2d Sess. (1934), *reprinted in* 1939-1 C.B. (pt. 2) 554, 570. Thus, not only does the Nevada law cited by Boyd employ different phraseology, its purpose is entirely different. It is inapposite in interpretation of section 165(d), as is the recent Nevada case law cited by Boyd. *See Hughes Properties, Inc. v. State,* 680 P.2d 970, 971-72 (Nev.1984) (take-off, although not result of wager engaged in by house, was includable in house "winnings" as defined by then-current Nevada law).