T.C. Memo. 1996-108


UNITED STATES TAX COURT


ROBERT LIBUTTI, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1042-93.          Filed March 7, 1996.

P gambled at T, a casino in Atlantic City, New Jersey, and incurred losses of $4,139,100 in 1987, $3,080,050 in 1988, and $1,215,900 in 1989. Aside from these losses, but as an enticement to frequent T, P received from T "complimentary" goods and services (comps) totaling $443,278 in 1987, $974,992 in 1988, and $1,126,856 in 1989. On his Federal income tax returns, P included these comps in his gross income and relied on sec. 165(d), I.R.C., to deduct from his gross income an equal amount of his gambling losses. <u>Held</u>: Sec. 165(d), I.R.C., allows him to deduct his gambling losses to the extent of the comps.

<u>Bernard Wishnia</u>, for petitioner.

<u>Daniel K. O'Brien</u>, for respondent.

LARO, Judge:  This case was submitted to the Court without trial.  Rule 122(a).  Robert Libutti petitioned the Court to redetermine respondent's determinations with respect to his 1987, 1988, and 1989 Federal income taxes.  Respondent determined that petitioner was liable for the following income tax deficiencies, additions to tax for delinquent filings under section 6651(a)(1), additions to tax for substantial understatements of income tax under section 6661, and an accuracy-related penalty for substantial understatement of income tax under section 6662(a), (b)(2), and (d):

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1) | Sec. 6661 | Penalty Sec. 6662 |
|------|-----------|----------|-------|---------|
| 1987 | $171,386 | $347,673 | $42,666 | --- |
| 1988 | 272,298 | 125,036 | 68,075 | --- |
| 1989 | 314,792 | 27,297 | --- | $62,958 |

Following petitioner's concession in his opening brief that he is subject to the additions to tax under section 6651(a)(1),[1] we must decide whether petitioner can deduct gambling losses to the extent of the value of "complimentary" goods and services

---

[1] Petitioner states in his brief that he cannot prove the filing date of his 1987 or 1988 tax return.  We consider this statement as petitioner's concession of the allegation in his pleading that the notice of deficiency as it relates to 1987 and 1988 is time barred under sec. 6501(a).  See Rule 142(a); Mecom v. Commissioner, 101 T.C. 374, 381-383 (1993) (discussion of the time bar of sec. 6501(a), including the burden of proof with respect thereto), affd. without published opinion 40 F.3d 385 (5th Cir. 1994).

(comps) that he received from Trump Plaza Associates, t/a Trump Plaza Hotel and Casino (Trump). We hold he can.[2] Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

## Background[3]

Petitioner resided in Secaucus, New Jersey, when he petitioned the Court. He filed 1987 and 1988 Federal income tax returns on November 20, 1989.[4] He filed a 1989 Federal income tax return shortly after April 15, 1990, and he did so without receiving an extension of time under section 6081(a). All of petitioner's returns were prepared by a certified public accountant, and petitioner filed them using the status of "Married filing separate return". On each return, petitioner reported profits from his horse brokerage business called Buck Chance Stables (the Stables), which was conducted as a sole proprietorship. Petitioner reported that the Stables' profits were $3,169,881 in 1987, $785,900 in 1988, and $796,031 in 1989.

---

[2] Accordingly, we also hold that petitioner is not liable for the additions to tax or penalty for substantial understatements.

[3] The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference.

[4] He also filed an amended 1987 tax return on or about the same day.

Petitioner gambled extensively. He played mostly craps, and he gambled mainly at Trump's casino (the Casino), which was situated in Atlantic City, New Jersey. In 1987, petitioner spent 84 days at the Casino, gambled on 75 of these days, made an average bet of $14,964, and had an overall loss of $4,139,100. In 1988, petitioner spent 179 days at the Casino, gambled on 148 of these days, made an average bet of $11,526, and had an overall loss of $3,080,050. In 1989, petitioner spent 304 days at the Casino, gambled on 70 of these days, made an average bet of $9,226, and had an overall loss of $1,215,900. On many of the occasions that petitioner played craps at the Casino, his total bets for one roll of the dice ranged from $50,000 to $100,000.

As a general practice, Trump, in its sole discretion, voluntarily transferred comps to its patrons to induce them to patronize the Casino. In some instances, but not in the case of petitioner, the comps were determined by a formula that allowed each patron to receive approximately 50 percent of Trump's anticipated win with respect to him or her.[5] The formula took into account a patron's average bet, the hours that he or she gambled at the Casino, the estimated number of hands that he or she played per hour, and a factor set by Trump to reflect the fact that the odds were in its favor. Trump's senior management determined the type and amount of petitioner's comps using their

---

[5] With respect to petitioner, Trump's anticipated win was $1,531,930 in 1987; $1,861,283 in 1988; and $542,050 in 1989.

sole discretion, as opposed to a direct application of this formula. Trump's payment of the comps to petitioner was discretionary.

A summary of petitioner's comps is as follows:

### 1987

| | |
|---|---:|
| Automobiles.................... | $319,300 |
| Vacations..................... | 48,778 |
| Jewelry....................... | 75,200 |
| | 443,278 |

### 1988

| | |
|---|---:|
| Automobiles and accessories.... | 872,920 |
| Vacations..................... | 55,560 |
| Jewelry....................... | 46,512 |
| | 974,992 |

### 1989

| | |
|---|---:|
| Automobiles and accessories.... | 806,858 |
| Premium champagne............. | 40,020 |
| Entertainment tickets......... | 279,978 |
| | 1,126,856 |

The automobiles and accessories included five Rolls Royces with an aggregate value of $916,300, three Ferraris with an aggregate value of $731,400 (exclusive of additional accessories of $14,875), one Bentley Corniche valued at $212,000 (exclusive of a $1,890 phone installed therein), one Mercedes Benz valued at $60,583, automobile repairs of $12,740, a $14,310 payment by Trump so that petitioner could trade a Bentley for a Rolls, and a $34,980 payment by Trump so that petitioner could trade a Bentley Turbo for a Bentley Corniche. The vacations included five European vacations with an average value of $17,568 and one

vacation in California valued at $16,500. The jewelry included a Rolex watch and bracelet valued at $32,300, a 2.7-carat diamond valued at $30,000, a bracelet and diamond earrings valued at $23,426, a bracelet watch valued at $19,800, a tennis bracelet valued at $12,900, and a diamond bracelet valued at $3,286. The champagne included 178 bottles of Cristal Rosé, valued at $225 a bottle. The tickets were to theater and sporting events such as the Super Bowl, the NCAA basketball tournament, boxing events, and the United States Open in Flushing Meadows, New York.

Casinos in New Jersey were prohibited from transferring cash comps to patrons during the subject years. See N.J. Stat. Ann. sec. 5:12-102m (West 1988).[6] Trump and petitioner used at least

---

[6] N.J. Stat. Ann. sec. 5:12-102m (West 1988) provides:

No casino licensee shall offer or provide any complimentary services, gifts, cash or other items of value to any person unless:

(1) The complimentary consists of room, food, beverage or entertainment expenses provided directly to the patron and his guests by the licensee or indirectly to the patron and his guests on behalf of a licensee by a third party; or

(2) The complimentary consists of documented transportation expenses provided directly to the patron and his guests by the licensee or indirectly to the patron and his guests on behalf of a licensee by a third party, provided that the licensee complies with regulations promulgated by the commission to ensure that a patron's and his guests' documented transportation expenses are paid for or reimbursed only once; or

(3) The complimentary consists of coins, tokens,
(continued...)

the automobile comps to attempt to circumvent this prohibition. Trump "purchased" the automobiles on behalf of petitioner, and petitioner contemporaneously "sold" the automobiles for cash, most (if not all) of which he gambled at the Casino. On November 22, 1991, the New Jersey Casino Control Commission, the State agency that regulates casinos, held Trump liable (and fined it $450,000) for nine separate violations of N.J. Stat. Ann. sec. 5:12-102m, stemming from Trump's "transfer" of automobiles to petitioner and his daughter. These automobiles, which had an aggregate value of $1,650,838, were the automobiles and accessories that petitioner "received" from Trump during 1988 and 1989, exclusive of the car phone, automobile repairs, and trade-in charge of $14,310.

---

[6](...continued)
cash or other complimentary items or services provided through a bus coupon or other complimentary distribution program approved by the commission or maintained pursuant to commission regulation; or

(4) The complimentary consists of noncash gifts, provided that such noncash gifts in excess of $2,000.00 per trip or such greater amount as the commission may establish by regulation provided directly to the patron and his guests by the licensee or indirectly to the patron and his guests on behalf of a licensee by a third party shall be supported by documentation regarding the reason the noncash gift was provided to the patron and his guests, including where applicable, a patron's player rating, to be maintained by the casino licensee. For purposes of this paragraph, all noncash gifts presented to a patron and the patron's guests within any five-day period shall be considered a single noncash gift.

Trump issued petitioner a 1987, 1988, and 1989 Form 1099-MISC, Miscellaneous Income, reflecting that it paid him the above-mentioned amounts of comps as "prizes and awards". Petitioner's 1987 amended return included in his gross income the amount of comps shown on the 1987 Form 1099-MISC, and it claimed that petitioner's total deductions from adjusted gross income equaled the amount of the comps. Attached to petitioner's amended return were: (1) A copy of the 1987 Form 1099-MISC and (2) a statement from Trump showing that petitioner's 1987 net gambling losses at the Casino equaled $4,139,100. The amount of comps shown on the 1988 and 1989 Forms 1099-MISC were reported on petitioner's 1988 and 1989 tax returns, respectively, as "Other income" from "TRUMP PLAZA ASSOC". These returns also claimed a matching miscellaneous itemized deduction (not subject to the 2-percent floor) for "GAMBLING LOSSES".

Respondent determined that petitioner's gross income for 1987 included the amount shown on the 1987 Form 1099-MISC.[7] With respect to petitioner's 1988 and 1989 taxable years, respondent determined that petitioner was not entitled to deduct his gambling losses in the amounts equal to the amounts of the comps. According to respondent's notice of deficiency, dated November 12, 1992, "Gambling losses are allowed only to the extent they offset gains from wagering. Income you received from

---

[7] Respondent's determination did not reflect the fact that petitioner reported the comps as income on his amended return.

Trump Plaza Associates cannot be treated as 'gains from wagering transactions' pursuant to Internal Revenue Code Section 165(d)."

## Discussion

Legal gambling is a multi-billion-dollar industry that has proliferated across the country and has become a major source of adult entertainment. In an effort to attract the attention of patrons, gaming establishments routinely offer comps. In the instant case, Trump paid more than $2.5 million in comps to petitioner during the subject years. The term "comps" is generally understood to imply "free of charge". Common sense, however, makes one strongly suspicious as to whether the comps received by petitioner were free of charge. If there is any truth to the time-tested adage that there is "no free lunch", one can hardly be surprised that respondent argues that petitioner's comps are taxable to him.

Petitioner reported the subject comps as gross income on his 1987 through 1989 Federal income tax returns (including the amendment to his 1987 return). Petitioner argues that the comps are not taxable to him because they are wagering gains which may be offset by his larger wagering losses.[8] See sec. 165(d). Respondent asserts that the comps are not wagering gains because they do not have a "strong nexus" to petitioner's wagering

---

[8] Petitioner also makes alternative arguments that the comps are not income. For purposes of deciding the sec. 165(d) issue, we will assume that the comps are properly includable in gross income.

transactions. Petitioner bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 165(d) provides that an individual may deduct his or her "Losses from wagering transactions * * * to the extent of the gains from such transactions". Neither the Code nor the regulations define the phrase "gains from such transactions". We apply the "plain, obvious, and rational meaning." Liddle v. Commissioner, 103 T.C. 285, 293 n.4 (1994), affd. 65 F.3d 329 (3d Cir. 1995); see also Boyd v. United States, 762 F.2d 1369, 1373 (9th Cir. 1985) (sec. 165(d) interpreted according to its "ordinary meaning").

According to Webster's New World Dictionary 551 (3d coll. ed. 1988), the primary meaning of the word "gain" is "an increase; addition; specif., a) [often pl.] an increase in wealth, earnings, etc.; profit; winnings". (Brackets in original.) A primary meaning of the word "from" is "out of; derived or coming out of". Id. at 542. The word "wager" means "bet", id. at 1500, which, in turn, connotes "an agreement between two persons that the one proved wrong about the outcome of something will do or pay what is stipulated", id. at 133. The word "transaction" is the noun of the infinitive "to transact", which means "to carry on, perform, conduct, or complete (business, etc.)". Id. at 1419.

Assuming for purposes of applying section 165(d) that the comps are gross income, petitioner's comps fit within the plain

meaning of the statutory text. The comps from Trump increased petitioner's wealth, and they were derived out of his betting transactions at the Casino. The fact that petitioner's receipt of the comps bore a close nexus to his gambling transactions at the Casino cannot be denied. Petitioner would not have received the comps from Trump but for the fact that he gambled extensively at the Casino. Although petitioner's receipt of the comps did not directly hinge on the success or failure of his wagers, he received the comps incident to his direct participation in wagering transactions. The relationship between petitioner's comps and his wagering is close, direct, evident, and strong. The comps are sufficiently related to his gambling losses for purposes of section 165(d). We hold that petitioner's comps are "gains from * * * [wagering] transactions" under section 165(d).

We recognize that the term "gains from * * * [wagering] transactions" has sometimes been equated with the term "gambling winnings". See Commissioner v. Groetzinger, 480 U.S. 23, 37 (1987) (White, J., dissenting) (full-time gambler may deduct gambling losses "to the extent of gambling winnings" in computing adjusted gross income); Collins v. Commissioner, 3 F.3d 625, 631 (2d Cir. 1993) (section 165(d) "only allows gambling losses to offset gambling winnings"), affg. T.C. Memo. 1992-478. Our current holding is not in conflict with these opinions. We agree with Justice White and the Court of Appeals for the Second Circuit that "gains from * * * [wagering] transactions" include

"gambling winnings".  We do not read those opinions, however, to suggest that "winnings" is the only meaning for the word "gains". Section 165(d) refers to "gains", not "winnings".  The word "gains" is broader than the word "winnings".  Not only does the word "gains" include "winnings", it also includes an "increase in wealth".  Webster's New World Dictionary, supra at 551.  If the Congress had wanted to limit the income prong of section 165(d) to gambling winnings, it would have said so.  Instead, the Congress used the word "gains", and, in so doing, allowed taxpayers to offset their gambling losses against increases to their wealth that arose out of their wagering transactions. Given the clarity of section 165(d), the beginning and end of our inquiry is the statutory text, and we apply the plain and common meaning of that text.  TVA v. Hill, 437 U.S. 153 (1978); United States v. American Trucking Associations, Inc., 310 U.S. 534, 543-544 (1940).  As we have learned from the Supreme Court, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  * * *  When the words of a statute are unambiguous, * * * judicial inquiry is complete."  Connecticut Natl. Bank v. Germain, 503 U.S. 249, 253-254 (1992); citations and quotation marks omitted.

We recognize the narrow interpretation that this and other Courts have given the income prong of section 165(d).  See, e.g., Allen v. United States, 976 F.2d 975 (5th Cir. 1992); Boyd v. United States, 762 F.2d 1369, 1373 (9th Cir. 1985); Bevers v.

Commissioner, 26 T.C. 1218 (1956).  Our opinion does not depart
from this view.  None of the prior cases dealt with the specific
facts at hand; namely, a gambler who received comps to induce him
to gamble.  The cases dealt mostly with taxpayers who worked in
gambling establishments, as opposed to placing bets in wagering
transactions there, and who received compensation that was
different than ordinary pay.  In Boyd v. United States, supra,
for example, the taxpayer was a professional poker player who
managed a casino's poker room.  The casino did not participate in
the poker games, but it earned money on the games by renting its
facilities to the players for a fee.  The taxpayer played in the
games to attract customers, and he received a portion of the fee.
The Court of Appeals for the Ninth Circuit held that the
taxpayer's portions of the fees were not gains from wagering
transactions under section 165(d).  The Court of Appeals found
controlling that the fees were a form of rental and were not
derived directly from wagering transactions entered into by the
taxpayer himself.  Id. at 1373.  Similarly, in Bevers v.
Commissioner, supra, this Court faced the question of whether
former section 165(d) allowed a dealer to offset his tips against
his gambling losses.  The Court held that it did not.  According
to the Court, the dealer's tips were gains from his labor as a
dealer, because the tips came to him in his employment as a
dealer.  Id. at 1220-1221.  Once again, the dealer did not
himself place the bet in the wagering transactions; rather, it

was the players who placed the bets.  Accord <u>Allen v. United States</u>, <u>supra</u>.

In conclusion, we hold that petitioner's comps are "gains from * * * [wagering] transactions" that may be offset by wagering losses under section 165(d).  In so holding, we have considered all arguments made by respondent with respect to section 165(d), and, to the extent not addressed above, have found them to be without merit.  In light of our holding, we need not consider petitioner's alternative arguments.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.