T.C. Memo. 2007-38


UNITED STATES TAX COURT


GEORGE E. AND GLORIA TSCHETSCHOT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9498-03.            Filed February 20, 2007.


        R disallowed losses in excess of Ps' winnings from
gambling and determined both a deficiency and a penalty
for substantial understatement for 2000.  After
conceding that H's net gambling losses were not
properly deductible, Ps argued that, as a professional
tournament poker player, W's net losses should be
treated the same as those of any other professional
sport participants.

        <u>Held</u>:  W's net gambling losses are not exempt from
the limitations of sec. 165(d), I.R.C.

        <u>Held</u>, <u>further</u>:  We leave for the parties to
determine as part of their computations under Rule 155,
Tax Court Rules of Practice and Procedure, whether
there was a substantial understatement for the taxable
year in issue; if so, Ps are liable for the accuracy-
related penalty.

Gloria Tschetschot, pro se.

J. Anthony Hoefer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, Special Trial Judge:  Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 2000 of $10,071, as well as an accuracy-related penalty for a substantial understatement of income tax of $2,014.  The grounds for the deficiency were the limitations of section 165(d) as applied to Gloria Tschetschot's (Mrs. Tschetschot) professional tournament poker playing and George E. Tschetschot's (Mr. Tschetschot) status as a nonprofessional gambler.[1]  At trial, petitioners conceded that Mr. Tschetschot was not a professional gambler but argued that Mrs. Tschetschot's professional tournament poker playing is not gambling and thus not subject to the limitations of section 165(d) on losses from gambling.  Respondent conceded that Mrs. Tschetschot's business expenses related to her professional gambling activity were deductible.  Thus, the two issues for decision are:  (1) Whether Mrs. Tschetschot's tournament poker losses are limited by section 165(d) to the amount of her tournament poker winnings, and (2)

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

whether a penalty under section 6662(a) for a substantial understatement of income tax is appropriate.

FINDINGS OF FACT

At the time the petition was filed, petitioners resided in Cedar Rapids, Iowa.

Mrs. Tschetschot is a database project engineer. She was also a professional tournament poker player in 2000.[2] Mr. Tschetschot is not a professional gambler but occasionally plays slot machines and blackjack while accompanying his wife on her poker tournament trips.

Tournament poker is somewhat different from "live-action" poker. A poker tournament consists of a series of individual events hosted by a casino, and it can last anywhere from several days to 2 weeks. Unlike live-action poker, tournament participants cannot exit the game by cashing out partway through the tournament; tournaments are played until there is one player left with all of the chips.

All tournaments have a "buy-in", or entrance fee, that is paid by the tournament participants to the tournament organizer. A portion of this amount is an administrative fee kept by the casino hosting the event, and the remainder goes directly into the prize fund "pot" that will ultimately be paid out to the

---

[2] Respondent stipulated this fact for purposes of this case only. There are no substantiation issues in this case.

tournament's winners.  No portion of the administration fee is included in the prize fund, and the entire prize fund is dispersed to winning participants.  The buy-in may or may not correlate dollar-for-dollar with the amount of chips received at the start of the tournament, and the chips themselves have no intrinsic monetary value.  Although "re-buys" are sometimes allowed, tournament play contemplates that each player has only a fixed number of chips and that each player begins the tournament with the same number of chips.  When a player runs out of chips, he or she is out of the game.  Cash prizes are awarded to a predetermined number of finishing places in the tournament.  Because of the buy-in system, the only monetary loss a tournament participant may incur will be the amount of the buy-ins and any re-buys the participant might make; no participant will be able to bet--or subsequently lose--any greater amount.  Similar to live-action poker, however, a player's tournament success depends on a combination of both luck and skill.[3]  A player might have a decent hand, but as Kenny Rogers tells us in "The Gambler", he or she would still have to "know when to hold 'em, know when to fold 'em, know when to walk away and know when to run" to actually be a success.

---

[3]  A court in England recently had the opportunity to decide whether Texas Hold 'Em was a game of chance or a game of skill, and the jury decided on the former.  See http://news.bbc.co.uk/1/hi/england/london/6267603.stm.

For 2000, the taxable year in issue, Mrs. Tschetschot earned approximately $49,000 in wages. She also participated in nine poker tournament series, winning in excess of $11,000.[4]

Mrs. Tschetschot claimed a net loss of $29,933 from her "professional gambler" activity in 2000 on her Schedule C, Profit or Loss From Business. Mr. Tschetschot claimed a net loss of $9,000 from his "professional gambler" activity in 2000 on his Schedule C.

Respondent determined a deficiency of $10,071 based on the view that the deductions claimed by petitioners related to their gambling activities were not appropriately Schedule C deductions, but rather deductions allowable on Schedule A, Itemized Deductions, but only to the extent of petitioners' winnings. Respondent also determined an accuracy-related penalty under section 6662(a) of $2,014.

At trial, petitioners conceded the issue as to Mr. Tschetschot but disputed the determination as to Mrs. Tschetschot. Respondent conceded Mrs. Tschetschot's status as a professional, as well as the corresponding treatment of certain expenses related to her professional gambling activity.

---

[4] The amount of Mrs. Tschetschot's stipulated winnings totals $13,269, whereas she reported only $11,708. Respondent discusses this discrepancy in his posttrial brief by saying that "Respondent did not adjust this discrepancy because the unreported winnings would have been offset by allowance of losses that were disallowed."

Respondent maintains that section 165(d) limits Mrs.
Tschetschot's losses and that petitioners remain liable for an
accuracy-related penalty.  Petitioners contend that Mrs.
Tschetschot's professional tournament poker playing activity is
more properly classified as "entertainment and professional
sports" than professional gambling and should bear the resulting
tax treatment; i.e., that her net loss should not be limited by
section 165(d) restricting losses from wagering activities.
Petitioners also contend that they do not meet the threshold
amount for the imposition of an accuracy-related penalty based on
a substantial understatement of income tax.

OPINION

I.  <u>Tournament Poker</u>[5]

Central to petitioners' contention is the thesis that
tournament poker, unlike other types of poker, is not a wagering
activity.

The term "wagering" has different meanings depending on the
context in which the term is used.  More often than not, and as
it is used in the Internal Revenue Code, the term is synonymous
with "gambling".[6]

---

[5]  The issue related to tournament poker is essentially
legal in nature; accordingly, we decide it without regard to the
burden of proof.

[6]  The legislative history of sec. 23(g) of the Revenue Act
of 1934, ch. 277, tit. I, 48 Stat. 680, 689 (subsequently
(continued...)

Congress has made a policy decision such that, while section 165 generally allows losses to be deducted from gross income, "[l]osses from wagering transactions shall be allowed only to the extent of the gains from such transactions."[7] Sec. 165(d); see also sec. 165(a). However, neither the Internal Revenue Code nor the regulations define what constitutes a wagering activity.

When a term is not defined, we must apply the term's "plain, obvious, and rational meaning." Liddle v. Commissioner, 103 T.C. 285, 293 n.4 (1994), affd. 65 F.3d 329 (3d Cir. 1995); see also Boyd v. United States, 762 F.2d 1369, 1373 (9th Cir. 1985). According to the dictionary, a "wager" is defined as "something risked or staked on an uncertain event" or "a bet". Random House College Dictionary (1968). Similarly, "to wager" is

---

[6](...continued) redesignated sec. 23(h) by the Revenue Act of 1938, ch. 289, 52 Stat. 461 and then continued as such in the 1939 Code until enacted as sec. 165(d) in the 1954 Code) uses the terms "wagering" and "gambling" interchangeably.

[7] Sec. 165(d) applies to both professional and recreational gamblers. See, e.g., Boyd v. United States, 762 F.2d 1369 (9th Cir. 1985); Offutt v. Commissioner, 16 T.C. 1214 (1951); Heidelberg v. Commissioner, T.C. Memo. 1977-133. One of the consequences to professional gamblers is that the loss carryover provisions of sec. 172 are unavailable for amounts attributable to wagering activity. That is not an issue in this case as Mrs. Tschetschot had other income to absorb her expenses properly deductible as a professional. One of the consequences to nonprofessionals is that they may only deduct gambling losses if they itemize deductions on their tax returns. Sec. 62(a); see also Heidelberg v. Commissioner, supra.

defined as:  (1) Something risked or staked on an uncertain event; bet; (2) the act of betting.  Random House College Dictionary (1973).  Courts have often had to differentiate between wagering and related activities on the one hand and those activities not falling into that category on the other.  See, e.g., Allen v. U.S. Govt. Dept. of Treas., 976 F.2d 975 (5th Cir. 1992) ("tokes" paid as tips to casino dealers are not gains from wagering transactions); Offutt v. Commissioner, 16 T.C. 1214 (1951) (betting on horse races is wagering); Libutti v. Commissioner, T.C. Memo. 1996-108 (gambler's receipt of complimentary goods from a casino was sufficiently tied to gambling participation that they were gains from wagering transactions); Whitten v. Commissioner, T.C. Memo. 1995-508 (expenses incurred to be a contestant on Wheel of Fortune were not wagering expenses); Heide v. Commissioner, 2 B.T.A. 451 (1925) (playing bridge for stakes is wagering).  However, courts have routinely held that poker is a wagering activity.  See, e.g., Boyd v. United States, supra.  But here, petitioners ask us to treat tournament poker differently than other kinds of poker.

After a careful review of the record, it is clear that while there are differences between tournament poker and other types of poker,[8] none rise to the level of meaningful, substantive

---

[8] The most significant difference is that unlike playing in a live-action poker game, when one buys into a tournament game,
(continued...)

differences that would warrant different tax treatment under the current Internal Revenue Code.

A. Tournament Poker as a Sporting Event

Petitioners argue that tournament poker is conducted in much the same way as other professional sporting tournaments. Participants pay an entry fee and compete to win prizes through their good fortune and superior skill. But simply because a sport or activity is played or conducted in a tournament setting does not transform the underlying activity into something different.[9]

Tournament poker play, much like live-action poker, necessitates the use of the word "bet" or "wager" even to describe how the game is played. Petitioners argue that the usage of the word "bet" in this context is insignificant. The Court sees it differently.

Betting is so intrinsic to poker that it is nearly impossible to avoid using a word that implies gambling in any way

---

[8](...continued)
each player receives the same fixed amount of chips. The game is played, and when a player runs out of chips, the player is out of the tournament. The playing continues until one player has all of the chips. It may take a different skill set to play tournament poker because no endless stream of funds is available, and endurance is a crucial factor to a participant's success.

[9] Similarly, a casino's decision to issue a Form W2-G, Certain Gambling Winnings, or a Form 1099-Misc., Miscellaneous Income, does not affect the nature of the winnings for tax purposes.

when discussing the topic. Bets are placed on each hand, and each round of betting has consequences. Whether or not the chips being used to make these bets have immediate and tangible monetary value does not change the fact that the players are still placing bets, hoping to win. This is true even in a tournament setting.

Petitioners agree that the first poker tournaments held were, in fact, "wagering events". For example, in those early games, "Each participant put up $10,000 and received $10,000 in chips." The fact that the chips being used to place bets in tournament poker today only bear some fractional relationship to the dollar values of the prizes and/or entry fees does not change the basic nature of the game as a wagering activity.

B. Professional Tournament Poker as a Business

Petitioners also raise an equal protection argument and argue that there is no valid reason to treat tournament poker differently, for tax purposes, from tournament golf or tennis. Petitioners argue that the benefits of being able to offset "exaggerated income" from very successful years by losses sustained in less successful years should be available to professional tournament poker players as much as they are to other professions.

Congress made a policy decision to treat businesses based on wagering activities differently. In the absence of Congressional

action, we are not free to correct any perceived unfairness stemming from a rationally based policy choice. In <u>Valenti v. Commissioner</u>, T.C. Memo. 1994-483, the Court noted that treating businesses based on wagering and gambling differently from other businesses is a rational differentiation and not one that rises to the level of being violative of due process or equal protection. See also <u>Steward Mach. Co. v. Davis</u>, 301 U.S. 548, 584 (1937) (holding that Congress, like the states, has the freedom to tax businesses differently). Thus, it has been held:

> [A] classification that differentiates the business of gambling from other business has "a rational basis, and when subjected to judicial scrutiny, it must be presumed to rest on that basis if there is any conceivable state of facts which would support it." * * *

<u>Valenti v. Commissioner</u>, <u>supra</u> (quoting <u>Carmichael v. Southern Coal Co.</u>, 301 U.S. 495 (1937)).

## II. Substantial Understatement of Tax

With respect to a taxpayer's liability for any penalty, section 7491(c) places on the Commissioner the burden of production, thereby requiring the Commissioner to come forward with sufficient evidence indicating that it is appropriate to impose the penalty. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. See

id. at 447; see also Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 6662(a) imposes a penalty equal to 20 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Sec. 6662(b)(2). An understatement is the amount by which the correct tax exceeds the tax reported on the return. Sec. 6662(d). The understatement is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return. Sec. 6662(d)(1)(A)(i) and (ii).

Section 6664(c)(1) provides that no penalty shall be imposed if the taxpayer demonstrates that there was reasonable cause for the underpayment and the taxpayer acted in good faith. The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the facts and circumstances of the situation and includes an "honest misunderstanding of fact or law". Sec. 1.6664-4(b)(1)(c), Income Tax Regs. Insofar as Mr. Tschetschot is concerned, petitioners have not demonstrated either good faith or that there was reasonable cause for their position. As to Mrs. Tschetschot, petitioners were clearly aware of the mandate of section 165(d); their wish that it be inapplicable to tournament poker does not constitute the type of misunderstanding contemplated by the statutes or the regulations.

An understatement is reduced by the portion of the understatement that is attributable to the tax treatment of an item for which there is substantial authority or with respect to which there is adequate disclosure and a reasonable basis.  See sec. 6662(d)(2)(B); sec. 1.6662-4(a), Income Tax Regs.  However, no substantial authority exists to support petitioners' position as to either the inapplicability of section 165(d) to tournament poker or Mr. Tschetschot's status as a professional gambler.  Substantial "authority [exists] for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."  Sec. 1.6662-4(d)(3)(i), Income Tax Regs.  Types of authority on which a taxpayer may rely include the Internal Revenue Code and regulations, revenue rulings and procedures, technical advice memoranda, and private letter rulings.  See sec. 1.6662-4(d)(3)(iii), Income Tax Regs.  Additionally, whether or not there was adequate disclosure, there is no reasonable basis to support petitioners' position on tournament poker given the clear mandate of section 165(d) and the existing caselaw interpreting it.  Accordingly, we are not permitted to make a reduction in the understatement attributable to respondent's determination on that issue.

In view of respondent's concession that Mrs. Tschetschot's expenses are deductible, it is unclear whether there exists a

substantial understatement of income tax.  We therefore leave for the parties to determine as part of the Rule 155 computation whether there was, in fact, a substantial understatement for the taxable year in issue.  If a substantial understatement exists for the year in issue, petitioners are liable for the accuracy-related penalty.

III.  Conclusion

The moral climate surrounding gambling has changed since the tax provisions concerning wagering were enacted many years ago. Not only has tournament poker become a nationally televised event, but casinos or lotteries can be found in many States. Further, the ability for the Internal Revenue Service to accurately track money being lost and won has improved, and some of the substantiation concerns, particularly for professionals, no longer exist.  That said, the Tax Court is not free to rewrite the Internal Revenue Code and regulations.  We are bound by the law as it currently exists, and we are without the ability to speculate on what it should be.  Accordingly, we hold that tournament poker is a wagering activity subject to the limitations of section 165(d).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.