Gerald S. and Sheryl ROBINSON,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. Civ. 98–1456–RE.

United States District Court,
D. Oregon.

Nov. 8, 1999.

Thomas H. Tongue, Robert K. Winger, Dunn, Carney, Allen, Higgins & Tongue, Portland, OR, for Plaintiff.

Kristine Olson, United States Attorney, District of Oregon, Portland, OR, Michael J. Desmond, Jennifer Whang, United States Department of Justice, Tax Division, Washington, DC, for defendant.

## OPINION AND ORDER

REDDEN, District Judge.

This is an action for tax refunds totaling approximately $248,000. Of the total, plaintiffs claim a refund of $100,102.50 in taxes, interest and penalties for the 1991 tax year, and $147,842.00 in taxes, interest and penalties for the 1988 tax year.

The matter before the court is the United States' motion for partial summary judgment. The United States seeks a determination from the court that:

1. Plaintiffs' claimed pass-through loss deduction from Motorsports Auto Sales,

Inc. must be reduced by $294,976 to remove a carryover operating loss from the 1989 and 1990 tax years.

2. Plaintiffs' claimed pass-through loss deduction from Motorsports Auto Sales, Inc. must be reduced to reflect losses properly attributable to Lake Village Motors, Inc. In the alternative, the United States asserts that the court has no jurisdiction over this claim because it was not raised in administrative proceedings.

3. Plaintiffs are not entitled to a claimed $55,000 worthless stock deduction.

4. Plaintiffs are not entitled to a claimed $113,280 pass-through capital loss for the foreclosure of real property, but instead realized a loss of only $25,445; however they also incurred unreported forgiveness of indebtedness income of not less than $175,548.67.

The motion is granted.

### Factual Background

Plaintiffs' claims for the 1991 tax year arise primarily from plaintiffs' investments in two separate groups of businesses. The first group comprises Motorsports Auto Sales, Inc., Motorsports Rental & Leasing, Inc. and Lake Village Motors, Inc., the successor in interest to Motorsports Auto Sales, Inc. These three businesses operated a car dealership at different locations in Portland, Oregon from 1987–1992. The second group of businesses is a partnership known as RSM and two corporations: Minnesota Gin Mill, Inc. and Minnesota Gin Mill Supper Club, Inc. (collectively "RSM/MGM"). RSM/MGM operated a bar and restaurant business on property located in Hibbing, Minnesota between 1983 and 1989.

### Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The requirement that an issue be "genuine" relates to the quantum of evidence the plaintiff must produce to defeat the defendant's motion for summary judgment. The authenticity of a dispute is determined by whether there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505.

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Assuming that there has been sufficient time for discovery, summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

A taxpayer seeking a tax refund bears the burden of proving that the assessment was incorrect and proving the correct amount of the tax owed. *Ray v. United States*, 762 F.2d 1361, 1362 (9th Cir.1985).

### Discussion

Counts II and III of plaintiffs' complaint relate to the automobile dealerships. Count II involves a pass-through operating loss deduction from Motorsports Auto Sales of $523,000, divided into two components: a loss of $228,624 for the 1991 tax year, and a $294,976 loss for the 1989 and 1990 tax years, which plaintiffs seek to carry forward to 1991. Count III involves a $55,000 worthless stock loss deduction.

Count IV relates to the bar and restaurant businesses, and involves a $113,280 pass-through capital loss deduction arising from the 1991 foreclosure of real property titled in RSM's name.

The United States asserts that it is entitled to summary judgment on Count II because 1) plaintiffs cannot carry over $294,976 from 1989–90 into the 1991 tax year; and 2) plaintiffs' alleged Motorsports operating loss of $228,624 must be reduced by the amount which actually represents losses attributable to Lake Village Motors or, alternatively, because plaintiffs failed to set out this claim in their administrative proceedings.

The plaintiffs concede that the United States is entitled to summary judgment on Count III.

The government asserts that it is entitled to summary judgment on Count IV because the actual tax consequences of the foreclosure transaction are a capital loss of only $25,445 and forgiveness of indebtedness of not less than $175,548.67, which should have been, but was not, reported as income.

### The Motorsports issues

#### Count II—the Motorsports operating loss of $294,976

In Count II, plaintiffs seek an income tax refund for the 1991 tax year and a carryover to 1988. Plaintiffs allege that Motorsports incurred a net operating loss of $554,454.00 in 1990. They seek a tax refund for this operating loss in two components: first a loss of $228,624 for the 1991 tax year; and second, a $294,976 loss for the 1989 and 1990 tax years, which plaintiffs seek to carry forward to 1991 pursuant to I.R.C. § 1366(d)(2).

Plaintiffs contend that they could not take the entire operating loss in 1990 because their total basis in Motorsports was only $171,572 in 1990. Since I.R.C. § 1366(d)(1) limits the amount of flow-through loss deduction to the sum of the shareholder's adjusted stock basis in an S corporation, plus the adjusted basis of any bona fide indebtedness from the corpora-

tion to the shareholder, plaintiffs assert that they could only carry over $171,572 from that loss. They now seek to carry over into 1991 the remainder of the net operating loss under I.R.C. § 1366(d)(2).

But plaintiffs actually requested and received an operating loss deduction of $259,478, not $171,572, in 1990. They have therefore reduced their claim by $87,906, and they now seek a tax refund for a carried-over operating loss of $294,976.

The United States contends that plaintiffs' basis in Motorsports was not $171,572, but $567,293. The latter amount reflects an additional $395,721 which was, the United States argues, contributed to Motorsports by Gerald Robinson (Motorsports' sole shareholder) in January 1990, when Robinson obtained a $500,000 personal line of credit from Seafirst Bank and then immediately contributed $395,721 of it to Motorsports, enabling Motorsports to pay off an automobile flooring loan owed to U.S. Bank. The United States asserts that this contribution makes plaintiffs' correct Motorsports basis $567,293—an amount greater than the total claimed net operating loss. So, the government argues, even if the plaintiffs' claimed loss of $554,454 were valid, they could have claimed the entire amount in 1990, leaving nothing to carry over.

Plaintiffs do not dispute that when funds are acquired by a shareholder in his personal capacity and used to pay off the shareholder's S corporation's debt, an increase in S corporation basis is the result. *See Bolding v. Commissioner,* 117 F.3d 270 (5th Cir.1997). However, they argue that the use of the funds borrowed from Seafirst to extinguish Motorsports' corporate indebtedness was merely a refinancing through a change of banks and not a voluntary change in the structure or nature of the loan. Gerald Robinson states in an affidavit that the Seafirst loans were not personal loans to him, but rather "continuations of previously existing Motorsports Auto Sales, Inc. ... loans." Affidavit of Gerald S. Robinson, ¶3. Although

Robinson acknowledges in his affidavit that the loans obtained from Seafirst were in his name only and showed only himself as the obligor, he asserts that they were "intended to be debts of my wholly owned S corporation, Motorsports," and that "all parties concerned knew the loan proceeds were to be used by Motorsports." *Id.* at ¶¶ 5, 6.

However, Robinson's deposition testimony differs from his affidavit. Robinson stated there that "Seafirst was a personal loan to me that we used for a floor plan. It paid off U.S. Bank." Robinson deposition, p. 275. He further testified that when he took out the loan with Seafirst, "Motorsports wasn't mentioned at all." *Id.* at 277.

█ The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. *See, e.g., Foster v. Arcata Associates,* 772 F.2d 1453, 1462 (9th Cir.1985); *UA Local 343 v. Nor-Cal Plumbing, Inc.,* 48 F.3d 1465, 1473 (9th Cir.1994). The court may therefore disregard affidavits that contradict deposition testimony when they are submitted solely to generate an issue of fact. *Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262, 266–67 (9th Cir.1991). Robinson's statement in his affidavit that he and Seafirst "believed" or "viewed" the Seafirst loan as a refinancing or a mere change of banks is both unsubstantiated by objective evidence and contradicted by his deposition testimony.

Plaintiffs argue that the corporate nature of the Seafirst loan is evidenced by the fact that the Seafirst loan documentation includes an assignment of U.S. Bank's security interest in the corporate collateral. However, according to Robinson's deposition testimony, this collateral consisted of the titles to $500,000 worth of cars which had largely been sold by the time Seafirst loaned the money. Indeed, it appears that the reason U.S. Bank called in the loan was that Motorsports had disposed of the assets pledged as security for the loan. *See* Robinson deposition, pp. 278–79 (U.S. Bank's security was "titles for $500,000 worth of cars . . . and we didn't have the cars on the lot, so we had to pay those cars off. In other words, they were sold previously.")

The assignment to Seafirst of a security interest in corporate collateral which had largely disappeared at the time the Seafirst loan was made is insufficient to create an inference that Seafirst looked to any entity other than Gerald Robinson for repayment of the loan.

█ The court concludes that the plaintiffs have not come forward with evidence which would create an issue of fact on whether the Seafirst loan was a corporate loan to Motorsports rather than a personal one to Gerald Robinson. Since this is an issue on which the plaintiffs would have the burden of proof at trial, the United States is entitled to summary judgment.

*Count II—the net operating loss of $228,-624*

Motorsports conducted the business of new and used car sales from June 1987 through April 1991. It appears from the evidence that in 1991, Motorsports was in financial trouble, primarily because it had not paid its federal employment taxes. Gerald Robinson states in his affidavit that IRS liens ("made it impossible for Motorsports to continue to actively do business . . .") Affidavit of Gerald Robinson, ¶ 12. In 1991, Lake Village Motors, Inc. was created as a separate corporation, with ownership split 75/25 percent between Robinson and another shareholder named Paul Stringer. Lake Village Motors did not acquire a dealership and the entire business activity of Lake Village Motors consisted of liquidating the last of Motorsports' inventory and collecting the proceeds. The proceeds of the sales, less costs, were passed through to satisfy Motorsports' financial obligations.

The United States asserts that a significant, unsubstantiated portion of the net operating loss claimed on behalf of Motors-

ports is in fact attributable to the activities of Lake Village Motors. The United States points out, and the plaintiffs concede, that the operating losses of one subchapter S corporation generally cannot be claimed on the tax return of another corporation; thus plaintiffs cannot claim a refund for net operating losses incurred by Motorsports if some of those losses were actually incurred by Lake Village Motors.

Plaintiffs argue that Lake Village Motors was a "mere conduit or liquidating agent" selling off Motorsports' inventory. Thus, the income or losses from that activity could properly be reported as Motorsports' income or losses. However, the evidence indicates that Lake Village was a separate and distinct S corporation, recognized as such on April 1, 1991, with a separate bank account and a different employer identification number. The evidence also shows that plaintiffs have consistently listed them as separate entities and that stock ownership is different between them (Robinson owns 100% of Motorsports' stock, but only 75% of Lake Village Motors' stock).

However, the court need not resolve the question of whether plaintiffs have established that Lake Village was an agent of Motorsports or a separate entity, because the United States has advanced another argument which is dispositive of this claim.

■ The United States argues that even if it is assumed that Lake Village income, expense and deduction items could be reported on Motorsports' corporate tax return and flow through to plaintiffs, the court lacks subject matter jurisdiction to grant a refund on that basis, under the doctrine of variance. Under this doctrine, a taxpayer is generally barred from asserting a claim in an action for a refund that was not raised in the administrative refund claim. The United States points out that neither the administrative refund claim nor the complaint makes any reference to Lake Village Motors.

The jurisdictional statute for actions for refund of illegally or improperly collected taxes is 28 U.S.C. § 1346. The Internal Revenue Code provides that no action for a refund may be maintained in any court until a claim for the refund has been filed with the Secretary of the Treasury in accordance with Treasury Regulations. 26 U.S.C. § 7422(a); *Quarty v. United States*, 170 F.3d 961, 972 (9th Cir.1999). The regulations require the taxpayer to specify in detail each ground for which a refund is claimed, with facts sufficient to apprise the Commissioner of the exact basis of the claim. 26 C.F.R. § 301.6402–2(b)(1). Compliance with these specificity requirements is a prerequisite to subject matter jurisdiction over a claim for a refund; thus a claim which does not meet the requirements of the Code and the regulations must be dismissed. *Quarty*, 170 F.3d at 972; *Boyd v. United States*, 762 F.2d 1369, 1371 (9th Cir.1985).

■ Plaintiffs do not dispute that their administrative claim fails to meet these specificity requirements. However, they argue that numerous audits and financial records relative to Lake Village "were made available" to the United States in the administrative process and therefore that the United States has not been surprised by the argument that Lake Village was merely a continuance of Motorsports or its liquidating agent. Plaintiffs' argument is without merit. The specificity requirement is jurisdictional, and plaintiffs do not deny that they have failed to satisfy it.

Section 7422(a) waives the sovereign immunity of the United States. Any limitations and conditions upon the waiver "must be strictly observed and exceptions thereto are not to be implied." *Lehman v. Nakshian*, 453 U.S. 156, 160–161, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981); see also *United States v. Trident Seafoods Corp.*, 92 F.3d 855, 864 (9th Cir.1996); *Tucson Airport Authority v. General Dynamics*, 136 F.3d 641 (9th Cir.1998). Even if the United States was not surprised, or prejudiced, by plaintiffs' failure to meet the specificity requirements, the court still lacks subject matter jurisdiction, and the claim must be dismissed.

*Count III—the Matorsports $55,000 stock loss*

Plaintiffs concede this issue.

*The RMS/MGM issues*

*Count IV—Capital loss of $113,280 from foreclosure on RSM/MGM property*

RSM was a partnership formed in 1983 whose principals were Gerald Robinson, William Spelts and Eugene Marcaccini. The purpose of the RSM partnership was to hold title to real property at 408 Howard Street in Hibbing, Minnesota ("the Howard Street property"), where MGM, Inc.'s restaurant and bar business was conducted. MGM, Inc. was incorporated in February 1983; the original shareholders were Robinson, Spelts and Marcaccini. In April 1985, Spelts sold his interest in the RSM partnership and in MGM, Inc. to Marcaccini for the sum of $1.00. In May 1988, Minnesota Gin Mill Supper Club, Inc. ("the Supper Club") was incorporated for the purpose of operating a restaurant business on the Howard Street property. The original shareholders of the Supper Club were Gerald Robinson (15%) and Timothy Norman (49%). In April and August 1984, and September 1989, Northern State Bank ("NSB") loaned money to MGM, Inc. ("the MGM promissory notes"). The MGM promissory notes were personally guaranteed by plaintiffs Gerald and Sheryl Robinson and by Eugene and Leona Marcaccini, and William and Helen Spelts. The notes were also secured by mortgages on the Howard Street property. In October 1986, NSB made a personal loan to the Robinsons ("the Robinson promissory notes"). In November 1989, MGM, Inc. and the Supper Club ceased operations, and Gerald Robinson attempted to sell the bar and restaurant businesses.

About October 15, 1990, the partnership, RSM, filed a Form 1065 income tax return for the 1989 tax year with the notation that "one of two partners withdrew 1–1–89." According to Treasury Regulation § 1.708–1(b)(1)(A)(i), a partnership terminates when all partnership interests are acquired by a single partner. There is no indication that any cash changed hands as a result of the termination of the partnership; there is some evidence that Robinson acquired Marcaccini's interest in both RSM and MGM, Inc. in exchange for the assumption by MGM, Inc. of $25,000 of Marcaccini's personal debt, through an increase in MGM's debt obligation to NSB.

In June 1996, a second (not an amended) tax return was filed, purportedly by RSM, reporting continuing partnership activity through 1989. There are no books or records for the RSM partnership in evidence for the period after 1986, so this reported activity cannot be substantiated.

Meanwhile, MGM and the Robinsons had defaulted on the promissory notes to NSB. The unpaid balance on the MGM promissory notes, which the Robinsons had guaranteed, was $245,196.76. The unpaid balance on the Robinson promissory notes was $57,955.24. In May 1990, the Howard Street property was sold at a tax sale to the State of Minnesota for nonpayment of county property taxes.

In September 1990, NSB brought an action against MGM, Inc., the Robinsons and others, seeking to foreclose the mortgages on the Howard Street property and to collect from the Robinsons personally the unpaid balance of the MGM and Robinson promissory notes.

In May 1991, the Robinsons entered into a settlement agreement with NSB ("the 1991 agreement"). Under the terms of the 1991 agreement, the Robinsons were fully released from their personal liability on both the MGM promissory notes and the Robinson promissory notes, in exchange for whatever interest remained in the Howard Street property and certain marketable securities conveyed to NSB. The 1991 agreement recites that the value of Robinson's interest in the Howard Street property conveyed was "less than $500." Since the Howard Street property had by then been sold for nonpayment of taxes, the "interest" in the Howard Street property conveyed to NSB was not a title interest; it appears to have been no more

than redemption rights. As a consequence of the 1991 agreement, the Robinsons withdrew their answer in the action filed against them and NSB obtained judgment by default.

Pursuant to the 1991 agreement, the Robinsons paid NSB $68,465.99 with the proceeds from the sale of their securities, in partial satisfaction of the MGM loans they had personally guaranteed. NSB also received a quitclaim deed for the Howard Street property signed by Marcaccini as well as Robinson, and stating that the consideration for that transfer was less than $500. In June 1991, a foreclosure judgment on the Howard Street property was entered.

Plaintiffs claim a $113,280 capital loss as a consequence of the foreclosure. The United States asserts that plaintiffs can claim a capital loss of only $25,445 and that they also received forgiveness of indebtedness income of not less than $175,548.67, which they did not report.

Plaintiffs' claim is based on three premises:

1. Because the quitclaim deed was signed by both Marcaccini and Robinson, on behalf of RSM, the property conveyed under the 1991 agreement must be viewed in three segments: a conveyance of marketable securities by the Robinsons; a conveyance of land and a building by RSM; and a conveyance of personal property and improvements to the Howard Street property by MGM.

2. The conveyance of land and building by RSM was the conveyance of a fee interest.

3. Because there were three conveyances by three entities, the tax consequences were separate for each.

The United States, on the other hand, argues:

1. The only parties to the 1991 agreement were the Robinsons and NSB: Marcaccini's signature on the quitclaim deed is meaningless because RSM was defunct after 1989, and the partnership's assets had all been acquired by Robinson; MGM was neither a party to the agreement nor the owner of any property conveyed under the 1991 agreement.

2. Because the Howard Street property had been sold at a tax sale, the interest conveyed in the Howard Street property under the 1991 agreement was less than a fee interest, and the value of this interest was fixed, in the 1991 agreement and the quitclaim deed, at less than $500.

3. The withdrawal of Marcaccini from RSM resulted in the termination of the partnership in 1989 and a constructive liquidation through which Robinson received all of RSM's assets—*i.e.,* whatever interest remained in the Howard Street property. Thus, the tax consequences of the 1991 agreement must be visited upon the Robinsons alone.

There is no evidence to support the plaintiffs' three assumptions. Nothing in the 1991 agreement itself suggests that the parties to the agreement were anyone but the Robinsons and NSB. The 1990 and the 1996 tax returns show that Marcaccini had withdrawn from the partnership as of 1989; at best the 1996 tax return shows only that RSM's partnership activity continued through the end of 1989. There are no books or records for the RSM partnership in evidence for the period after 1986. The fact that the quitclaim deed was signed by both Marcaccini and Robinson, and that the Howard Street property was originally held by RSM, does not make RSM a party to the 1991 agreement, particularly when the evidence shows that RSM was defunct by then. Nor is it probative that a 1991 tax return filed by RSM reported the transfer of the Howard Street property, since all the other evidence indicates that RSM had ceased to exist no later than the end of 1989. Plaintiffs' tax returns, without more, are insufficient to establish their claims. *Mays v. United States,* 763 F.2d 1295, 1297 (11th Cir.1985) *and cases cited therein.*

There is no evidence that the conveyance of the Howard Street property in the 1991 agreement represented the transfer

of a fee interest, and in fact the evidence indicates otherwise. Both the 1991 agreement and the quitclaim deed place a value of less than $500 on the interest conveyed. There is evidence that taxes had not been paid on the property when RSM owned it and that it had been sold at a tax sale. Thus, whatever interest Robinson had to convey in the 1991 agreement, it was not a fee interest.

Because the evidence shows that RSM was defunct, with all its assets having been acquired by Robinson, that MGM had ceased operations as of 1989, and that neither RSM nor MGM was a party to the 1991 agreement, there is nothing to support plaintiffs' position that the property conveyed under the 1991 agreement belonged to RSM, MGM and the Robinsons, and was properly taxed as three separate transactions. I conclude that the securities and the interest in the Howard Street property conveyed in the 1991 agreement were the property of the Robinsons alone, and should have been taxed accordingly.

The question to be addressed next is how the property conveyed under the 1991 agreement should be valued.

Plaintiffs argue that the basis of the assets transferred to NSB was $395,300. This calculation is based on the marketable securities' value (basis $121,788), the land and building of the Howard Street property with a basis of $238,652, and "equipment and improvements," on the Howard Street property with a basis of $34,860. Since the amount of indebtedness that was canceled was $303,152, this would make the total loss $92,148.

I find plaintiffs' argument unpersuasive because it is premised on the assumption that property belonging to MGM and RSM was conveyed under the 1991 agreement, and that the interest conveyed in the Howard Street property was a fee interest. As discussed above, both these assumptions are contrary to the evidence.

The United States argues that the fair market value of the Howard Street property interest conveyed under the 1991 agreement must begin with the premise that the partnership had terminated when all the partnership interests were acquired by a single partner. Thus, once Marcaccini withdrew from the partnership, Robinson received all of RSM's assets—i.e., the interest in the Howard Street property—through a constructive liquidation. The tax consequences of this event were that 1) Robinson recognized taxable gain only to the extent that any cash distributed from the partnership exceeded his basis in the partnership; 2) Robinson's basis in the property received in the liquidation was the same as his basis in the partnership, less any cash distributed in the liquidation; and 3) the partnership recognized no gain or loss on the liquidation.

Since there is no evidence that any cash was distributed to Robinson upon termination of the partnership, there was no immediate tax consequence to the termination. The only asset held by Robinson upon termination of the partnership appears from the evidence to have been the interest in the Howard Street property. Robinson's basis in the partnership, then, became his basis in the Howard Street property upon conversion of the partnership to a sole proprietorship.

Plaintiffs have not calculated Robinson's basis in the RSM partnership as of January 1989, and there are no RSM financial documents available which would permit a computation to be made. However, the United States has made a calculation based on the assumption that a partner's basis consists of the running balance of his contributions to and withdrawals from the partnership, adjusted to account for the running balance of his distributive share of partnership income, loss and expenses. The United States calculates Robinson's basis as of January 1989 by determining the year-end capital account reported by the partnership on its 1988 Form 1065. The Form 1065 reports Robinson's 1988 year-end capital account as $34,445. That amount has been reduced by $8,500 to reflect a flow-through RSM loss claimed and allowed on plaintiffs' 1989 Form 1040

tax return. This makes Robinson's basis as of January 1, 1989 $25,945. This partnership basis becomes Robinson's basis in the property constructively distributed to him upon termination of the partnership—i.e., the Howard Street property.

Robinson's basis in the securities conveyed under the 1991 agreement was $127,103.33.

■ Thus, the amount realized by the Robinsons from the 1991 agreement is the fair market value of the property conveyed ($500 for the Howard Street property + $127,103.33 for the securities), less Robinson's basis in property conveyed ($25,945 for the Howard Street property + $127,-103.33 for the securities)—a capital loss of $25,445. Plaintiffs have not refuted these calculations.

As of April 17, 1991, the unpaid balance on the three MGM promissory notes guaranteed by the Robinsons and the two Robinson promissory notes was $303,152.00. The 1991 agreement effected a full release of the Robinsons' personal liability in this amount. Thus, the net result of the 1991 agreement was a transfer of property worth $127,603.33 to satisfy a debt obligation to NSB of $303,152. As the United States points out, a creditor's discharge of indebtedness for less than the face amount of the debt conveys an economic benefit to the taxpayer that is the functional equivalent of income. I.R.C. § 61(a)(12). Thus, the Robinsons incurred forgiveness of indebtedness in the amount of $175,548 and a capital loss of $25,445.

I do not find persuasive plaintiffs' argument that they were mere guarantors of the promissory notes and thus incurred no forgiveness of indebtedness income when NSB released them from their personal liability on those notes. I agree with the United States' argument that because NSB had sued the Robinsons personally on their guarantee obligation, at the time the 1991 settlement agreement was executed, there was nothing contingent about plaintiffs' liability.

Plaintiffs have made no evidentiary showing which supports their claim to a $113,280 capital loss as a consequence of the foreclosure on the Howard Street property. I therefore award the United States summary judgment on this issue.

### Conclusion

The United States' motion for partial summary judgment (doc. # 39) is GRANTED.

IT IS SO ORDERED.